576 So.2d 1 (1990)
STATE of Louisiana
v.
Ty C. TRAHAN.
No. 89-K-1224.
Supreme Court of Louisiana.
April 30, 1990.
Rehearing Granted June 21, 1990.
Dissenting Opinion June 26, 1990.
Order for Remand January 15, 1991.
On Rehearing March 8, 1991.
*2 Lewis Unglesby, Unglesby & Brown, for applicant.
William J. Guste, Jr., Atty. Gen., J. Nathan Stansbury, Dist. Atty., Glenn Foreman, Asst. Dist. Atty., R. Kline, Asst. Dist. Atty., for respondent.
Dissenting Opinion by Judge Dennis June 26, 1990.
COLE, Justice.[*]
At issue are whether certain evidentiary rulings by the trial court deprived defendant of his right to a fair trial. After a thorough review of the record, we find no reversible error in the trial court's rulings. We therefore affirm defendant's conviction.

FACTS
On the night of July 1, 1987, the victim, twenty year old Andrea Trahan (no relation to defendant) and her girlfriend Tracy Morgan went to Raylee's Lounge in Crowley, Louisiana. Defendant, Ty Trahan, arrived at the lounge with two other women. Although defendant and the victim had dated for approximately a month and a half, their relationship was apparently tapering off. Tracy Morgan testified she and the victim were planning to go to Lafayette the next day to meet Doug Stutes, the victim's ex-fiance.
Defendant and the victim sat together at a table at the lounge for approximately forty-five minutes, alternatively talking and arguing about their relationship. At one point, defendant was seen grabbing the victim by the neck and arm, and the victim was observed crying. The victim later spoke to Tracy about her discussion with defendant, explaining she told him she "couldn't live the way he wanted her to live" and "wanted her own life." Shortly after this incident, Tracy and the victim left and went to the victim's house. While there, Tracy discovered she left her cigarette case at the lounge. The victim told Tracy she would return to the lounge in order to retrieve the cigarette case. She also stated she wanted to make sure defendant was not stranded at the lounge, since he had been having car trouble earlier.
*3 At 5:00 a.m. that morning, deputies at the Acadia Parish Sheriff's office heard defendant knocking at the rear door of the facility. The deputies opened the door and defendant walked in, highly excited and bleeding from his left leg. Deputy Lincoln Spell, the first deputy to see him, noted defendant smelled as though he had been drinking and had slurred speech. Sergeant Mike Guidry of the sheriff's office attempted to have defendant sit down. Defendant kept jumping up. He told Guidry, "I'm Ty Trahan, I've been shot in my left leg, and my girlfriend, they shot her head off. She's outside in the car. Please help."
The deputies went outside to the sheriff's office parking lot and found a silver colored 1984 Plymouth Turismo with the headlights on and ignition switch engaged. Although the engine was not running, an electric fan under the hood was still on, indicating the engine had been recently shut off.
Inside the car, the deputies saw the victim's lifeless body in a pool of blood. Her head and upper torso were laying on the passenger seat; the lower portion of her body was straddled across the middle console and driver's seat. Her right leg was near the vehicle's clutch pedal. Her left leg was crossed over the right leg and was on the passenger side. A MAC-11 semi-automatic handgun was on the passenger side floorboard. One spent cartridge was found near the weapon, another was found beneath the victim's body, and a bullet was found on the driver's seat.
The victim had two gunshot wounds. Both bullets entered the back of her neck. One bullet exited through her chin, the other exited through the front portion of her neck. An autopsy revealed she died as a result of a bullet severing her spinal cord. Defendant had two gunshot wounds in his left leg. Both his wounds resulted from bullets entering the front portion of his leg and exiting from the rear portion.
Defendant was brought to the American Legion Hospital to have his wounds treated. At that time, an atomic absorption test was performed on defendant's hands. This test revealed defendant had recently discharged a weapon. The same test was performed on the victim's hands, and it revealed she had not discharged a weapon. Deputy Johnny Meyers talked to defendant at the hospital. Defendant asked Meyers if he thought defendant shot the victim. Meyers replied he did not know who shot the victim, but that someone shot her. Apparently wanting to deny the implication he killed the victim, defendant stated had he shot her, "nobody would have ever found the body because I'm not crazy."
Defendant was subsequently charged with second degree murder (La.R.S. 14:30.1). At trial, the state theorized the victim and defendant had a violent argument in the victim's car over the victim's intention to break off their romantic relationship. It theorized the victim attempted to drive to the sheriff's office for help, but before she could do so, defendant grabbed her, held her head down and shot her twice. In support of this theory, the state put on expert testimony to establish defendant intentionally shot the victim. Relying on photographs showing the wounds, testimony concerning the trajectory of the bullets, and bone fragment patterns on the defendant's jeans, the state's experts concluded the victim's head was placed against defendant's leg. They concluded the same bullets which passed through the victim's body also passed through defendant's leg. This opinion was reached because the victim's blood was above the entry holes on defendant's jeans. In addition, a bone fragment pattern found around one of the holes in defendant's jeans suggested the same bullet which broke the victim's jaw bone also went into defendant's leg and carried the fragments with it.
The defense argued the victim's death resulted from a tragic accident. Defendant testified the victim returned to the lounge at approximately 4:00 a.m. When defendant's car would not start the victim offered him a ride and he accepted. After going one block, defendant remembered he left his two guns in his car and feared someone might steal them. He requested the victim turn around so he could get the guns. He then retrieved the guns, placing *4 his .44 magnum between the seats and placing his semi-automatic 9 millimeter MAC-11 on his lap. The two stopped for breakfast at Rayne, Louisiana. At that time, defendant put the 9 millimeter gun on the floorboard. When he returned to the car, he again placed the gun on his lap and fell asleep. He awoke when he felt the 9 millimeter gun slip from his lap and fall on the floorboard. The victim stopped the car near the sheriff's office and leaned forward to pick up the weapon. Defendant reached the weapon first and picked it up with his right hand. He transferred it to his left hand and prepared to place it into the back seat. As he did so, defendant claimed the weapon accidently discharged, hitting the victim.
Realizing the victim was shot, defendant claimed he attempted to get help by driving to the sheriff's office. He jumped from the passenger side and attempted to open the driver's door. Finding it locked, he went back to the passenger side and moved the victim's body in such a way as to allow him access to the controls. Defendant explained he pulled the victim's legs over his own and operated the clutch with his left leg straddled over the console. He steered with his left hand and used his right hand to move the accelerator.
The defense put on expert testimony which contradicted the state's expert testimony. According to the defense experts, the victim's head was positioned above, rather than against, defendant's leg. On this basis, the defense expert concluded the shooting was accidental.
The jury, in an eleven to one verdict, found defendant guilty of second degree murder. He was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. The court of appeal affirmed defendant's conviction. State v. Trahan, 543 So.2d 984 (La.App. 3rd Cir.1989). This court granted defendant's application for certiorari to more fully consider the record in this case. 556 So.2d 1252 (La.1990).

ANALYSIS
Defendant originally briefed sixteen assignments of error to this court. In a supplemental brief, he grouped these into eight specifications of error. For the purpose of clarity, this opinion will be organized according to those specifications.

Specification No. 1
In this specification, defendant argues the lack of random allotment procedures for the assignment of cases in the Fifteenth Judicial District Court denied him a fair trial. Prior to trial, defendant filed a "motion for random allotment." The trial court denied this motion. Defendant applied to the court of appeal for supervisory writs. The court of appeal denied defendant's application, finding no error in the trial court's ruling. This court likewise denied defendant's application. 520 So.2d 431, 432 (La.1988).
Defendant again raised the issue on appeal. The court of appeal rejected defendant's argument, noting:
The judges of the Fifteenth Judicial District have determined not to implement a rule providing for random allotment of criminal cases. Indeed, because the district consists of eleven judges who must rotate between three parishes, such a rule in this district would have the effect of limiting the district attorney's right to determine when a case is prosecuted. Appellant in the instant case does not establish nor does the record show that the current system of allotment operates to deny constitutional rights. If defendant felt the trial judge in the instant case was somehow biased to the extent of an inability to conduct a fair and impartial trial, the appropriate remedy would have been a motion to recuse the particular judge. La.C.Cr.P. art. 671.
543 So.2d at 990.
After the court of appeal rendered its opinion in the present case, this court handed down State v. Simpson, 551 So.2d 1303 (La.1989). In that case, we ordered the Fifteenth Judicial District judges to adopt a system whereby capital and other felony cases are allotted on a random or rotating basis. However, we clearly emphasized *5 our order was "prospective only." 551 So.2d at 1305.
Defendant argues the present case has already been reversed by this court on the basis of a footnote in Simpson, in which we said "[i]nsofar as State v. Trahan ... conflicts with this order, it is overruled." 551 So.2d at 1304 n. 3. Defendant overstates the meaning of this sentence. We simply noted any language in the court of appeal opinion approving the allotment procedures in the Fifteenth Judicial District was overruled insofar as it conflicted with our order. We did not mean to address, nor could we have addressed, the merits of defendant's claim, since it was not properly before us at that time. Therefore, we find no merit in defendant's argument in this regard.
Secondly, defendant argues his case was still subject to direct review at the time Simpson was decided, and he is therefore entitled to the benefit of the Simpson rule. In support, he analogizes his case to Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), in which the United States Supreme Court applied a newly declared constitutional rule to all cases pending on direct review or not yet final. We find Griffith distinguishable, since it did not deal with a situation such as the one before us, where the order was expressly made prospective only. Defendant presents no compelling rationale as to why we should supplant this clear pronouncement and give our order retroactive effect. He makes no showing of particularized prejudice arising out of the former system. As the court of appeal noted, defendant was free to bring a motion to recuse Judge Mouton if he felt the judge was unable to conduct a fair and impartial trial. Defendant did not do so.
We find no merit to this specification.

Specification No. 2
Defendant argues the trial court erred in excluding the results of blood alcohol tests of defendant and the victim which were contained in the state's crime lab report.[1] During cross-examination of the state's expert witness, the defense attempted to question him on the blood alcohol levels listed in the report. The state moved to exclude any reference to the tests, based on unreliability and also on the failure of the defense to notify the state it was raising intoxication as a defense. The trial court granted the state's motion and excluded the evidence on the basis of this court's decisions in State v. Rowell, 517 So.2d 799 (La.1988), and State v. Lowdins, 412 So.2d 1349 (La.1982). The court apparently believed these cases held blood alcohol tests were not admissible into evidence because they were "unreliable."
In Rowell, supra, we held that in order for the state to avail itself of La.R.S. 32:662's statutory presumption of intoxication arising from a chemical analysis of blood, the state must show it has promulgated and complied with detailed procedures insuring the integrity and reliability of the chemical test. In State v. McElroy, 553 So.2d 456 (La. 1989), we explained the state must show compliance with these procedures only if it intends to use the presumption of La.R.S. 32:662. If it does not, then the blood alcohol tests are treated as any other offering of scientific evidence. It may be excluded on due process grounds if the results are in fact unreliable. 553 So.2d at 458 n. 1. Therefore, we find the trial court misconstrued our decisions when it held blood alcohol tests were never admissible.
Nonetheless, we find the trial court reached the correct result in excluding the tests. La.Code Crim.Proc. art. 726 provides:
Art. 726. Notice of defense based upon mental condition
A. If a defendant intends to introduce testimony relating to a mental disease, defect or other condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall not later than ten days prior to *6 trial or such reasonable time as the court may permit, notify the district attorney in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other orders as may be appropriate.
B. If there is a failure to give notice as required by Subsection A of this Article, the court may exclude the testimony of any witness offered by the defendant on the issue of mental condition. (emphasis added).
The purpose of art. 726 and the other discovery rules in the Code of Criminal Procedure is to "eliminate unwarranted prejudice which could arise from surprise testimony." State v. Toomer, 395 So.2d 1320, 1329 (La. 1981). Intoxication is an "other condition" bearing on the issue of whether the defendant had the mental state for the offense charged. State v. Quinn, 479 So.2d 592, 596 (La.App. 1st Cir.1985); State v. Gipson, 427 So.2d 1293, 1298 (La.App. 2d Cir.1983).
In the present case, the defense sought to use the blood alcohol levels to support its "tragic accident" theory  i.e., defendant did not intend to shoot the victim.[2] The record contains no evidence defendant gave the required notice to the state under article 726.[3] Without such notice, the state had no way to prepare expert testimony to explain the blood alcohol levels and put them into proper prospective. The introduction of seemingly high blood alcohol levels by the defense experts without an opportunity for rebuttal by the state would needlessly confuse and prejudice the jury. State v. Caldwell, 504 So.2d 853 (La.1987). Therefore, we find the trial court properly exercised its discretion under article 726 and excluded the evidence.
Defendant argues the blood alcohol levels were highly relevant for the purpose of supporting his version of the events and also for cross-examining the state witnesses. Of course, the right to present relevant evidence is an important component of defendant's constitutional right to present a defense and all relevant evidence necessary to that defense must be presented for a full adjudication. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Vigee, 518 So.2d 501 (La. 1988). We find defendant's rights in this regard were not impaired. A review of the record shows there was ample evidence supporting defendant's claim he had been drinking. Deputy Lincoln Spell, the first deputy to encounter defendant, testified he smelled of alcohol and slurred his words. Tracy Morgan testified defendant consumed two "Fuzzy Navels" (a drink consisting of peach schnapps and orange juice), four beers and four Jaegermeisters between 11:00 p.m. and 4:00 a.m. Defendant testified he had been drinking since about 4:00 p.m. on the afternoon preceding the shooting. The defense extensively cross-examined the state's expert on his failure to take defendant's intoxication into account in his reconstruction of the crime. Finally, we note the defense counsel actually mentioned the blood alcohol levels of defendant and the victim during his cross examination of the state's serology expert. This line of questioning was not excluded by the trial court and was available for consideration by the jury.
Taking into account all the circumstances, we find the trial court properly excluded the blood alcohol tests. This specification lacks merit.

Specification No. 3
Defendant argues the trial court erred in ruling a videotape reenactment of *7 the events inside the victim's car was inadmissible. The videotape was produced by the defense in order to counter testimony by the state's expert that it was physically impossible to drive the car in the manner recounted by defendant. The trial court viewed the videotape in camera and found it inadmissible. The court reasoned the tape did not accurately depict the condition or position of the parties. The court also denied a request by the defense to adduce testimony about the reenactment from the participants.
The videotape shows a man and woman approximately the same size as defendant and the victim in a car similar to that of the victim. The man is sitting slightly forward with the head and torso of the woman between him and the seat. The woman remains in this position throughout the reenactment. The reenactment is performed twice, the first time with the vehicle door closed and the second time with it open. The videotape was made at night under relatively poor lighting conditions.
This court has previously dealt with reconstructed evidence. In State v. Boyer, 406 So.2d 143 (La.1981), the defendant claimed he heard a telephone ringing two separate times while he was in a detached garage, but did not hear a gunshot. In order to rebut this testimony, the state conducted a decibel test which showed if the telephone was audible outside the house, so was a gunshot. The defense objected, claiming the test did not take into account the fact it was raining at the time of the gunshot. We found the test admissible, noting:
The probative value of such an experiment or reconstructed evidence depends in large measure upon the extent to which the reconstructed scene was identical to or similar to that which existed at the time the incident happened. State v. Brumfield, 329 So.2d 181 (La.1976).
406 So.2d at 149.
We found the failure to take the rainfall into account did not make the scene dissimilar, since the rainfall was not a critical element for the purposes of the test:
This test was only introduced to show that if the telephone was audible outside, so was the gunshot. The gunshot had a reading of 96 decibels, while the sound of a telephone ringing did not register at all on the audible decibel reader when measured in the garage. Even if the sound of rain on the roof would have made the gunshot more difficult to hear, it would also have made the telephone more difficult to hear.
406 So.2d at 149.
Thus, we concluded that while a recreation need not be exact in every detail, the important elements of the test must be identical or very similar to the scene in order to have probative value.
Having reviewed the videotape, we find it does not meet the standard set forth in Boyer, supra. The reenactment has no probative value since it does not depict the parties in an identical or similar manner to the incident as testified to by defendant. The reenactment shows the victim's body remaining in one position throughout the drive. By contrast, defendant testified the victim's body "moved" and was in at least three different positions during the half block drive: (1) leaning on his left shoulder and the seat; (2) leaning on his back shoulder and/or resting on his back; (3) propped between his elbow and left shoulder. Each position would presumably create a different obstacle to driving the car in the manner defendant suggested. Nonetheless, the videotape depicts only one position of the victim (victim's head and torso behind defendant). The trial court found this position facilitated the subject's accessibility to the accelerator and steering wheel which would not have been present in the other positions testified to by defendant.
The position of the victim is the crux of the reenactment. It is not a minor discrepancy, such as the rainfall in Boyer, supra. In not following defendant's account of the facts, the videotape created a substantial possibility of misleading the jury into believing defendant could have driven the car, when this inference may not have been warranted under defendant's testimony. Defendant argues the state could have *8 pointed out this inaccuracy during cross-examination. We disagree. The often quoted maxim "a picture is worth a thousand words" applies to the present case. The strong impact of seeing an inaccurate reenactment creates such a substantial possibility of prejudice that it is unlikely cross-examination could effectively point out the discrepancies. As noted in McCormick on Evidence, § 214 (2d ed. 1972):
The extreme vividness and persuasiveness of motion pictures, however, is a two-edged sword. If the film does not portray original facts in controversy, but rather represents a staged reproduction of one party's version of those facts, the danger that the jury may confuse art with reality is particularly great. Further, the vivid impressions on the trier of fact created by the viewing of the motion pictures will be particularly difficult to limit or, if the film is subsequently deemed to be inadmissible, to expunge by judicial instruction.
This is an area where the trial court's decision must be given much deference. We find no error in the decision to exclude the reenactment.
This specification lacks merit.

Specification No. 4
In this specification, defendant argues the trial court erred in limiting the testimony of Dr. Freeman, the defense expert in forensic pathology. The state's crime scene reconstruction expert, Jim Churchman, testified that based on his investigation, the shooting could not have taken place accidentally as defendant claimed it did. On cross examination, the defense questioned Churchman on omissions in his investigation, including his failure to measure the interior of the vehicle. The defense attempted to follow up on this theme when it questioned its own expert, Dr. Freeman. The defense asked Dr. Freeman if he would need to know "the positions of the seats, the distances within the vehicle, the distances between the available space of the potential riders, size of the rider, the height of the interior of the car" in order to reconstruct "completely and accurately, from a forensic pathologist standpoint of what may have occurred in that car." The state objected, on the ground the question called for an answer outside Dr. Freeman's field of expertise. The trial court sustained the objection. Defendant argues the matter was not beyond Dr. Freeman's expertise, since he had more experience, education and training in death scenes than the state's expert.
The trial court is vested with wide discretion in determining the competence of an expert witness, and its ruling on the qualification of the witness will not be disturbed absent an abuse of discretion. State v. Watson, 449 So.2d 1321 (La. 1984); State v. Trosclair, 443 So.2d 1098 (La.1983); State v. Michel, 422 So.2d 1115 (La.1982).
Although the defense attempted to phrase the question in such a way as to make it fall within Dr. Freeman's expertise, the trial court found he was not qualified to answer it. We agree the question called for an answer outside the realm of forensic pathology, the only field in which Dr. Freeman was qualified as an expert. We further note the defense had an adequate opportunity during the cross-examination of Churchman to ask the same questions and challenge the basis of Churchman's conclusions. Therefore, we find no abuse of discretion by the trial court
Secondly, defendant argues the trial court erred in not allowing Dr. Freeman to make an independent examination of the crime scene evidence using his own equipment. We find no merit to this argument. Although the trial court did deny defendant's motion to remove the evidence, it expressed a willingness to reconsider the motion if defendant were able to show the state's lab equipment was inadequate. Defendant never reapplied to the trial court complaining the state's equipment was inadequate.
We find no merit to this specification.

Specification No. 5
In this specification, defendant argues the trial court erred in refusing to admit into evidence the autopsy report made by Dr. Remus. Dr. Remus, the state *9 pathologist who performed the autopsy on the victim, testified as to the cause of the victim's death, the trajectory of the bullets, and the positioning of her head on defendant's leg. He was of the opinion one of the wounds was a "contact" wound, meaning the barrel of the gun was very close to the victim's flesh. Although Dr. Remus brought the autopsy report with him to the stand, he did not use it while testifying.
After the completion of Dr. Remus' testimony, but prior to the testimony of the defense pathologist, the defense sought to introduce the autopsy report into evidence. The state argued the report was hearsay. The trial court denied the defense's request to admit the report, since Dr. Remus had not used the report while testifying. Defendant now argues the failure to admit the report prevented the defense expert from testifying fully as to the basis for his opinions and also blocked attempts by the defense to discredit Dr. Remus' testimony.
The report of the coroner has long been held to be admissible to show the cause of death. State v. Holmes, 258 La. 221, 245 So.2d 707 (1971); State v. Hayden, 171 La. 495, 131 So. 575 (1930). La.Code Crim. Proc. art. 105 provides in pertinent part:
A coroner's report ... shall be competent evidence of death and the cause thereof, but not of any other fact. (emphasis added).
In the present case, there was no dispute as to the cause of the victim's death. Instead, the defense sought to admit the report because it did not mention the presence of contact wounds, although Dr. Remus mentioned these in his testimony. Clearly, the narrow exception of art. 105 does not apply to this situation.[4]
Defendant next argues the failure to admit the report made it impossible for Dr. Freeman, the defense expert, to give the basis for his opinion as required by La.R.S. 15:465. We find no merit to this argument. The record shows Dr. Freeman's testimony was based on hypotheticals and post-mortem photographs. Further, Dr. Freeman was allowed to testify as to the inconsistencies in the autopsy report:
Q: Isn't it true, sir, that as a forensic pathologist and coroner of many years experience, if an autopsy reflects a contact wound it should say so in the autopsy report?
A: Yes, sir. We certainly teach that.
Q: And isn't it true that if a contact wound is found in doing an autopsy by a pathologist, that would be noted specifically in the report?
A: It should be, yes, sir.
Q: And the term would be what?
A: Contact wound.
Q: All right.
A: Or burn markings, or ring burn markings, or stelly globack injuries. There are a number of terms they use for that.
Q: All right. Were any of those contained in the autopsy report that you observed?
A: No, sir.
Q: Is there anything in the autopsy report that you observed that would give one reason to believe, reading that report, that they were contact wounds?
A: No, sir.
We note defendant's argument in the present case is similar to one raised and rejected in State v. Daigle, 440 So.2d 230 (La.App. 3rd Cir.1983), writ denied 444 So.2d 123 (La.1984). In Daigle, the defendant wanted the report in evidence "to have something for [his] forensic pathologist to refer to." The court held the trial court did not abuse its great discretion in "refusing to allow the jury to attempt to decipher the medically prepared report." We find this sound logic applies with equal force in the present case. The contents of the report were testified about in great detail by the experts on both sides. Any inconsistencies between the report and Dr. Remus' testimony were exposed, both on cross-examination and by Dr. Freeman's testimony. We see no compelling reason *10 why the autopsy report should have been admitted.
This specification lacks merit.

Specification No. 6
In this specification, defendant argues he was denied a right to place evidence before the jury with regard to the victim's state of mind on the day before her death, while the state was able to present testimony from the victim's mother and Tracy Morgan on this issue. The victim's mother, Betty Trahan, testified her daughter had dated defendant for five or six weeks. She moved in with him for a week, but "couldn't tolerate him anymore" and came back home. She was "still seeing him off and on" but was "trying to cool it" and "was going to break up" with defendant. Mrs. Trahan further testified the victim had plans to meet her old boyfriend on the morning of July 1 and "maybe get back together" with him. The defense did not object to this testimony.
During its case, the defense called Wayne Manley. Manley testified on direct examination about the quick trigger of the 9 millimeter gun involved in the shooting. On redirect, the defense asked Manley about an encounter he had with the victim on the day before she died. The state objected on the ground this question was not within the scope of the direct examination and was therefore improper on redirect. The trial court initially sustained the objection, but then changed its mind. The defense was allowed to pursue the matter, but was warned the court would not allow hearsay testimony. The defense then attempted to have Manley testify to a conversation between him and the victim which occurred at 2:00 p.m. on the day before the shooting. Manley would have testified he had seen the victim with defendant on the afternoon before her death, and the victim made statements to Manley which were inconsistent with any intent on her part to break up with defendant. The defense argued the testimony fell within the res gestae exception to the hearsay rule. The trial court ruled the testimony did not fall within the res gestae given the time frame of the conversation.
In this court, defendant argues the trial court's ruling was erroneous and deprived the jury of relevant evidence. He contends since the state was allowed to present evidence relating to the victim's intent to break up with defendant, he should be allowed to present contrary evidence on the same issue in the interest of fairness. He cites this court's case in State v. Gremillion, 542 So.2d 1074 (La.1989), for the proposition that hearsay may be admissible even in the absence of a recognized exception if it is "reliable and trustworthy and its exclusion would interfere with defendant's constitutional right to present a defense." 542 So.2d at 1078.
We initially note the only basis articulated at trial for admitting Manley's testimony was res gestae. We find the trial court's ruling in this regard was correct. Res gestae is defined in La.R.S. 15:447 and 448:
§ 447. Res gestae defined; admissibility
Res gestae are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events. What forms part of the res gestae is always admissible in evidence.
§ 448. Relation of res gestae to criminal act
To constitute res gestae the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
The statement which Manley would have testified to clearly does not fit within these definitions. The statement was made approximately fourteen hours prior to the shooting. It is not part of "continuous transaction" and is not part of the res gestae.
At trial, the only basis of defendant's objection to the trial court's ruling was res *11 gestae. He raises the "fairness exception" for the first time on appeal. It is well settled an additional basis for an objection urged for the first time on appeal cannot be considered on review. La.Code Crim. Proc. art. 841; State v. Stoltz, 358 So.2d 1249 (La. 1978). Nonetheless, since this court's decision in Gremillion, supra, was not available to defendant at the time of trial, we will consider his arguments in regard to that case.
In Gremillion, supra, the defendant sought to have a hearsay statement made by the victim to police admitted since it named someone other than the defendant as the attacker. The statement did not fall under any recognized hearsay exception. The victim had died and was unavailable at trial. Under these circumstances, we allowed the statement to be admitted. It was emphasized, however, that this was a very unusual exception to the rules of evidence and should be "sparingly applied." 542 So.2d at 1079 (Lemmon, J., assigning additional reasons).
The present case is not one in which Gremillion's reasoning applies. The circumstances of the statement made to Manley do not show it was particularly reliable or trustworthy, unlike the Gremillion statement, which came straight from the victim's mouth to an unsuspicious witness at a crucial time. Further, depriving defendant from using the statement did not impair his constitutional right to a defense. Defendant had an adequate opportunity to rebut the state's motive evidence. Defendant himself testified he and the victim were still seeing each other on a regular basis, and he was not in any way jealous of her contact with other men. The defense had an opportunity to cross-examine Mrs. Trahan, but chose not to do so. Under these circumstances, we cannot say Manley's testimony was crucial to defendant's constitutional right of defense.
We find no merit to this specification.

Specification No. 7
In this specification, defendant argues the trial court erred in excluding the testimony of one of its witnesses because of a sequestration violation. The witness, Ceasar Simon, testified he had seen the 9 millimeter MAC-11 used in the shooting fire three times with one trigger pull. This testimony supported the defense's theory that the gun was known to misfire. During cross-examination, Simon revealed he had spoken with defendant in violation of the trial court's sequestration order:
Q: When was the last time you spoke to Ty?
A: I see Ty almost every day.
Q: You spoke to him yesterday, didn't you?
A: What was yesterday? Monday?
Q: Yes, sir.
A: I don't think I spoke to him yesterday. Yeah, I did, I spoke to him.

Q: Where were you when you spoke to him?
A: At his house.
Q: Did you go see him or did he come see you?
A: I went and saw him.
Q: Did you discuss with him about this gun you went over the gun with him?

A: We talked about the gun, sure.

(emphasis added).
Out of the hearing of the jury, the trial court fined Simon $100 for his violation. When the jury returned, the trial court informed them of Simon's violation and admonished them Simon's testimony "is to be disregarded completely, as being inadmissible." The court of appeal found no abuse of discretion by the trial court, since the violation of the sequestration order was committed with defendant's "knowledge and connivance."
The purpose of sequestration is to assure a witness will testify as to his own knowledge. State v. Parker, 421 So.2d 834 (La. 1982). The action taken in the face of a violation of a sequestration order rests within the sound discretion of the trial judge. State v. Narcisse, 426 So.2d 118 (La.1983); State v. Kimble, 407 So.2d 693 (La.1981); State v. Jones, 354 So.2d 530 (La.1978). However, where the exclusion *12 is of a defense witness, the defendant's constitutional right to compel the attendance of witnesses and to present his defense may be impaired. State v. Warren, 437 So.2d 836 (La. 1983). Excluding a witness's testimony in the absence of consent, connivance, procurement or knowledge of the defendant or his counsel is not a constitutionally permissible means of insuring reliable testimony. State v. Jones, supra.
In the present case, the record leaves little doubt the violation was committed with defendant's knowledge and connivance. Simon testified he and defendant spoke about the gun the day before he testified, despite full awareness of the trial court's order. While perhaps harsh, the trial court's decision fell within his discretion and did not impair defendant's constitutional rights.
In addition, we note even if the exclusion of Simon's testimony was error, the error was harmless. David Simon, Simon's twenty-eight year old son, testified he saw the gun misfire at the same time his father did. Defendant also testified to the gun's history of misfiring. Therefore, Simon's testimony was at most cumulative and not critical to the defense.
This specification lacks merit.

Specification No. 8
In this final specification, defendant adopts by reference several assignments of error from his original brief. All these assignments were dealt with adequately by the court of appeal, and we find no merit to them as raised here.

Assignment # 4:
Defendant argues the trial court erred in permitting the state's expert (Jim Churchman) to draw bone fragments he observed on defendant's pants so another state expert (Dr. Remus) could testify on the basis of the drawing. Churchman testified he observed bone fragments around a bullet hole in defendant's jeans. Since no photograph of these fragments existed, Churchman drew a diagram which was shown to Dr. Remus. Dr. Remus concluded the pattern of fragments showed the bullet traveled through the victim's head and forced bone fragments into defendant's leg. This supported the state's theory that the victim's head was very close to defendant's leg during the shooting, and was used to rebut the theory advanced by the defense's expert.
Defendant argues this drawing was an attempt by the state to "manufacture" evidence. However, the crime lab report states numerous bone fragments were detected around the margins of the uppermost bullet hole in defendant's jeans. Therefore, defendant's arguments on this point lack merit.
Defendant also argues the trial court erred in the "overall treatment" of the admissibility of the state's expert testimony. This argument lacks merit. The record shows the defense failed to lodge objections to the qualifications of the state experts. Further, the defense had ample opportunity to cross-examine the state's experts such as Churchman on their failure to take into account certain information. Such an issue goes to the weight, not the admissibility of expert testimony.

Assignment # 11:
Defendant argues the prosecution delivered an overly broad opening statement which failed to inform the defense of the evidence to be presented at trial. He contends a mistrial should have been granted on this basis.
The trial court found the opening statement was proper. It is well settled the trial judge has wide discretion in controlling the scope and extent of the opening statement. State v. Brown, 428 So.2d 438 (La.1983); State v. Nettleton, 367 So.2d 755 (La.1979).
We find the trial court did not abuse his discretion. La.Code Crim.Proc. art. 766 provides the opening statement of the state shall explain the nature of the charge and set forth in general terms the nature of the evidence by which the state expects to prove the charge. Our review of the record shows the state's opening statement complied with this article.

*13 Assignment # 12:
In this assignment, defendant objects to the reference by the state's witness to a "silencer" on the gun. The state's expert testified in detail regarding the functioning of the weapon which killed the victim. When asked about the purpose of the threaded muzzle, the expert replied it was for the installation of a silencer. Defendant objected, arguing this was prejudicial, since the state knew no silencer was on the weapon at the time of the shooting. The trial court ruled the testimony irrelevant and admonished the jury to disregard it.
We find the reference, while perhaps deliberately elicited by the state, was not so prejudicial as to deny defendant his right to a fair trial. We further find the trial court properly admonished the jury to disregard the statement. There is no evidence defendant was dissatisfied with this instruction, or requested a mistrial at the time. Therefore, these arguments lack merit.

Assignment # 13:
Defendant argues the trial court erred in allowing the state's expert to give opinions regarding the victim's wounds, noise from the gunshot and the position of the parties in the vehicle when the expert made no personal investigation of these things. Our review of the record discloses defendant failed to raise contemporaneous objections at trial on the grounds the expert's opinions were without proper foundation. Further, we find there is no prohibition against experts relying in part on tests and examinations performed by others in arriving at their opinions. State v. Andrews, 369 So.2d 1049 (La. 1979). Therefore, this assignment lacks merit.

Assignment # 15:
In this assignment, defendant argues the evidence presented at trial was insufficient to support a guilty verdict for second degree murder. Viewing the evidence in the light most favorable to the prosecution, the court of appeal found any rational trier of fact could have found defendant guilty beyond a reasonable doubt of the crime of second degree murder. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Our extensive review of the record shows this conclusion to be correct. This assignment lacks merit.

Assignment # 16:
In this final assignment, defendant argues the court of appeal erred in failing to remand the case for a new trial on the basis of newly found evidence. Prior to trial, the state told the defense the interior seats of the victim's car were unavailable for examination because they had been lost. After the trial, defendant learned the seats and car had been available. He argues the unavailability of the vehicle prior to and during trial interfered with his ability to examine and do scientific tests on the actual car.
Absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process of law. Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); State v. Lindsey, 543 So.2d 886, 891 (La. 1989). Defendant has made no showing of bad faith on the part of the state. Further, since the evidence involved was a mass produced automobile, defendant could perform scientific tests and obtain measurements from any car of the same make and model. The record shows he in fact did so. Therefore, defendant has not shown he was prejudiced in any way by the unavailability of the car. This assignment lacks merit.

DECREE
For the reasons assigned, the judgment of the court of appeal affirming defendant's conviction is affirmed.
AFFIRMED.
LEMMON, J., dissents.
DENNIS, J., dissents and assigns reasons.
WATSON, J., dissents, disagreeing with the treatment and conclusion as to Specification No. 2.
DENNIS, Justice, dissenting.
I respectfully dissent. The trial court erred in excluding the results of blood alcohol *14 tests of the defendant and the victim, the video demonstration that the defendant's account was not physically impossible, and the autopsy report of the state pathologist. The evidence was relevant and admissible. Individually and collectively the trial court's rulings were highly prejudicial to Trahan's right to present a defense and cannot be dismissed as harmless.

ORDER ON REMAND
IT IS HEREBY ORDERED that the case of "State of Louisiana versus Ty Trahan, Number 89 K 1224", on the docket of the Louisiana Supreme Court, be remanded to the 15th Judicial District Court, Parish of Acadia, and the Court there ordered to accept and implement the plea agreement as agreed to and stipulated to by the State and defendant within thirty (30) days.
IT IS FURTHER ORDERED that the State and defendant file a motion to dismiss the appeal within seven (7) days of the new sentencing.

ON REHEARING
PER CURIAM.
After this Court's action of June 6, 1990, granting the defendant's application for rehearing, the state and defense filed a joint motion to remand the case to the district court for defendant to enter a plea of guilty of manslaughter pursuant to a plea bargain. The case was remanded to the district court with directions to implement the plea bargain. A joint motion to dismiss has now been filed in this Court stating that the plea agreement has been implemented and new sentencing occurred on February 14, 1991. La.S.Ct. Rule V, Section 4. The motion is hereby granted and this Court's order of January 19, 1990, granting certiorari and review, 556 So.2d 1252 (La.1990), is recalled.
NOTES
[*] Judge Melvin A. Shortess of the Court of Appeal, First Circuit, participated in this decision as Associate Justice Pro Tempore.
[1] The crime lab report lists an ethyl alcohol level of .26 in the blood of defendant and an ethyl alcohol level of .15 grams percent in the blood of the victim. Although this report was later put into evidence, the section referring to the blood alcohol levels was excluded.
[2] In his brief to this court, defendant appears to suggest the evidence of alcohol did not go to intent, but rather made defendant's explanation of the events "more plausible." However, La. R.S. 14:15 states voluntary intoxication during the commission of a crime is "immaterial" except "where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent."
[3] Defendant claims he informed the state in his answer to discovery he had no evidence of mental disease, defect or alcoholism "except that which was under its control." However, this statement clearly does not meet the requirements set forth in art. 726(A).
[4] Part of the report may have been admissible for impeachment purposes under the "contradictory statement" exception in La.R.S. 15:493. However, the defense did not attempt to admit the report during Dr. Remus' testimony.