SEXTON, Judge.
Appellant, Jeffrey Dale Hilburn appeals his conviction for second degree murder. Hilburn was convicted as charged of the second degree murder of Mark Jones. Hil-burn now appeals the conviction asserting three assignments of error: (1) the trial court erred in refusing to allow the defense witness, JoAnn Williams, to testify as an expert as to the authorship of the alleged suicide note, (2) viewed in the light most favorable to the prosecution, the evidence does not support a conviction for second degree murder, and (3) the trial court erred by failing to declare a mistrial on defendant’s motion, based on the prosecutor’s closing argument. We affirm.
Hilburn dated Karen Spaulding from late 1989 through March of 1991 when they ended their romantic relationship. However, Hilburn and Karen still maintained a platonic relationship after their break up. During the time that they were romantically involved, Hilburn lived with Karen in her parents’ house with Karen’s aunt and her aunt’s boyfriend, Aaron Rubion. Karen’s parents banned Mark from the house in March of 1991 after he allegedly stole Rubion’s gun and pawned it. Karen had Hilburn arrested for this theft.
Hilburn seemed to have constant financial trouble and allegedly caused financial problems for Karen also. After his arrest for the gun theft, Hilburn granted Karen a power of *237 attorney over Ms financial affairs for the purpose of enabling him to get back on Ms feet and as a precautionary move in case he had to serve time in jail.
Karen met the victim, Mark Jones, in April of 1991 while they were both working at Wal-Mart. At first they were only friends, but their relationship quickly grew into a romantic one. Mark and Karen were planning to move to the western United States and join the Wal-Mart management program together. During this time, Karen still talked with and occasionally saw Hilburn. Mark was aware of these conversations and visits and understood the continuing platonic relationship to be for the purpose of helping Hilburn get back on his feet. Mark never appeared jealous. On the other hand, Hil-burn wrote letters to Karen during tMs time expressing his jealousy of Mark and his desire for Karen to give him another chance. Two of these letters were admitted and read into evidence in their entirety at the trial.
Karen owned two vehicles, a Toyota and a Mazda. The Toyota was older and in need of repairs. Hilburn had offered to fix the Toyota. Karen used to carry a .38 caliber revolver in the Toyota for protection. Once Karen started driving the Mazda exclusively, Hil-burn suggested that she move the .38 to the Mazda. This was a couple of weeks before the alleged murder. A few days before the alleged murder, the .38 was missing from the Mazda.
The evening of the alleged murder, June 12,1991, Mark went over to Karen’s house to cook and eat dinner. When he arrived, Karen was on the phone with Hilburn discussing plans to bring the Toyota to Hilburn to be fixed. Hilburn asked what time Mark was leaving and Karen said around 10:30 p.m.
After spending the evening together, Mark left Karen’s house, purportedly to go home. Unfortunately, he never made it to his house. On their way to work and school on the morning of June 13,1991, Mark’s mother and sister discovered Mark’s ear on the shoulder of Highway 80 at an area known as Crew Lake. They stopped and looked inside the car, only to find Mark dead, with a .38 in his right hand.
When the police arrived, they had to pry open the locked doors. The coroner declared Mark dead at the scene. He was found sitting in the driver’s seat, slumped over toward the passenger side, with two gunshot wounds to the right side of his head. The chief investigator, Officer Robinson, found a cocked pistol in Mark’s hand. At the trial, Officer Robinson identified this pistol as the same one that Karen identified as missing from her Mazda. There were five bullets found in the gun. Two were fired, two were unfired, and one was a misfire. Officer Robinson opined that in his experience these rounds were reloaded wad-cutters. More shells and a holster were found on the passenger side floorboard. There was also a neatly folded, typed suicide letter in Mark’s lap between his legs. The sheriffs office initially treated the matter as a suicide.
Meanwhile, Hilburn called Karen early on the morning of the thirteenth of June and told Karen he had called her twice the previous night. Karen did not remember talking to Hilburn, nor receiving any phone calls from him on that night. Hilburn met Karen after class, where he handed her a bookbag (which contained a .357 Magnum, a holster, and bullets) and said it was to replace her missing .38. They ate lunch at McDonald’s and then went to Wal-Mart so Karen could find Mark. Hilburn went into a different department while Karen was looking for Mark. A fellow employee told Karen what had happened to Mark. Karen, extremely upset, found Hilburn and accepted his offer to drive her wherever she wanted to go. After Hilburn drove Karen home, she drove the Toyota to Mark’s parents’ house and Hilburn took her Mazda to the airport, where he was employed.
The police interviewed Karen and showed her the suicide note. Karen suggested that they talk with Hilburn. During this interview, a lady named Mrs. Patterson called to inform the police that both of her sons had seen a red motorcycle parked behind Mark’s car at Crew Lake at different times the night of Mark’s death. Karen told the police that Hilburn had a red and black motorcycle and where they could find it. Pictures were taken of Hilburn’s motorcycle and the two Pat *238 terson boys said the bike they saw looked like the one in the pictures. Hilburn was then brought in from the airport for questioning.
Initially, Hilburn was calm and relaxed and denied being anywhere near Crew Lake the previous night. After first denying that he knew Mark well or the type of car Mark drove, he admitted he knew Mark’s car because he had seen it parked at Karen’s house on several occasions. He also told the police that he did reload rat-shot and hollow point bullets. Hilburn also admitted to being “kind of jealous” of Karen and Mark.
Once confronted with the fact that his bike had been spotted behind Mark’s car the previous night, Hilburn began to tell a different story. During this oral statement, which was given after waiving his rights, Hilburn told the officers that Mark had called him and arranged a meeting between the two later that night. Hilburn claimed that he met Mark at a Fina gas station on Highway 80 where Mark asked Hilburn to follow him to Crew Lake and then to get into the car with Mark.
Hilburn told the officers that Mark had discussed committing suicide with him on an earlier occasion and had asked Hilburn for his assistance. Hilburn went on to say that Mark had handwritten and then typed a letter because he did not want it in his own handwriting. Hilburn then changed his story to say that he went to Sandel Hall at Northeast Louisiana University to type the letter. Hilburn told the officers that he knew basically what Mark wanted in the letter because he had talked with Mark about the contents. At this point, Hilburn said he did not have the letter written by Mark.
Once inside the car, Hilburn said that he told Mark he had the typed suicide letter and gave it to Mark, who then put it in his lap. Hilburn claimed to have tried to talk Mark out of committing suicide and admitted to Mark that he had considered it himself.
Next, Hilburn claimed that Mark took the gun out of the glove box and loaded it in the driver’s seat. Mark supposedly lost courage and put the gun down. Hilburn then claimed that he thought Mark was going to shoot him so he reached for the door handle but Mark assured Hilburn he was safe and asked him if he would do anything for Karen. Hilburn told Mark he would and then grabbed the gun. Hilburn told the officers that Mark then grabbed Hilburn’s wrist and guided the gun to Mark’s head. According to Hilburn, he tried to pull the gun away from Mark’s head, but it went off in the process and wounded Mark. Because Mark was in great pain, crying, screaming and bleeding, Hil-burn squeezed the trigger again. Hilburn then followed Mark’s instructions and put the gun in a cocked position in Mark’s right hand and locked the doors.
After giving his oral statement, Hilburn agreed to give a recorded statement. However, the recorded statement differed in some respects from the oral statement. For instance, Hilburn was much more elaborate in describing his efforts to convince Mark not to kill himself. Hilburn denied that Mark had written a suicide letter which Hilburn was to use as a guide for the typed letter. Hilburn also denied that Mark ever gave him such a letter. Instead, Hilburn claimed that Mark had told him certain things he wanted in the letter. He claimed Mark bemoaned the fact he couldn’t make a go of it with women. Hilburn then stated that Mark handed him the gun, but that Hilburn pleaded with Mark that he could not do it. Mark then supposedly guided Hilburn’s arm up to Mark’s head and assured Hilburn it wasn’t his fault. Next, Hilburn claimed again that the gun went off as he tried to pull it away and that he put the gun back up to Mark’s head and pulled the trigger again in response to Mark’s cries of pain.
Hilburn then claimed to have called Karen around 11:30, went home, and cried and shook as he contemplated turning himself in.
At the trial, Karen testified for the prosecution. Karen noted that Mark had never mentioned suicide and how parts of the suicide letter sounded like things that Hilburn would have written rather than Mark. Karen described how some of the statements in the letter coincided with discussions she and Hilburn had and that she had never had any of these types of discussions with Mark.
*239 The state also called Sherry Hutto, an assistant manager at Wal-Mart who worked with Mark. She testified that Mark was a good employee in no danger of losing his job and that they had discussed his plans to move out west and join the management training program. A family friend of the Joneses, Aubrey Griggs, testified that he had spoken with Mark on the evening of the 12th, during which conversation Mark appeared very happy and extremely talkative. Mark allegedly told Griggs about his plans to join the management program out west and to take his girlfriend on a trip to Disneyworld. Griggs testified that Mark did not sound depressed or suicidal over the phone.
Other aspects of the testimony tended to show Hilburn’s scheming prior to the shooting. Karen testified that Hilburn had told her to move the gun to the Mazda. Glen Waters, a security guard at the Monroe Airport, testified that Hilburn came to the airport around 9:00 or 9:30 p.m. on June 12th to leave a book bag for Karen. At this time, Hilburn was wearing a jacket and gloves which Waters noticed was unusual for mid-June. Hilburn was also apparently carrying a money bag inside of his jacket and mentioned to Waters that he was going out to the lake. Waters decided to check the book bag and found boxes of .38 shells and a revolver inside. Waters testified that Hilburn returned to the airport between 11:00 and 12:00, still wearing the jacket and gloves, but he no longer had the money bag.
Another airport employee, Allyson Ogles, testified that Hilburn returned to the airport on the afternoon of the 13th. Hilburn told Ogles that he and Karen had gone to Wal-Mart to find Mark and that Karen told him that Mark had killed himself. Ogles called Mark’s house looking for Karen and talked to Mark’s sister, Tiffany. When Ogles got off the phone, she told Hilburn that she had spoken with Tiffany. Hilburn responded by mentioning the fact that in the suicide letter Mark asked Karen to take care of Tiffany for him. Ogles testified that she did not ask and that Hilburn did not volunteer how he knew what the suicide letter had said.
Hilburn testified in his own defense at the trial, but this testimony changed drastically from the contents of his initial statements given to the police on the day after the murder. At trial, Hilburn’s theory was that Mark had typed the suicide note and plotted to kill Hilburn in an effort to rid himself of competition for Karen’s affections. There was also a hint that Karen was in on this plot. Hilburn claimed that his statement to the police was the result of an overdose of nerve medication.
Hilburn testified that Mark had called him numerous times trying to set up a meeting and that they had agreed that on the 12th Mark would leave Karen’s and meet Hilburn at the Fina gas station. Hilburn testified that he followed Mark to Crew Lake and got in the ear with Mark. Hilburn described Mark as sounding depressed and not being able to stay on one subject very long. Hil-burn claimed that Mark complained about Karen spending too much time with Hilburn recently and that Hilburn was causing problems in Mark’s plans with Karen.
Hilburn then testified that Mark opened the glove box, removed the pistol, placed it on his lap, and said that in order for Karen to be happy, Mark had to leave the picture. Mark allegedly had the suicide note with him and tried to give it to Hilburn so that Hil-burn could be sure Karen understood what was going on. Hilburn claimed that upon his refusal to take and read the letter, Mark put it back in his lap. Hilburn’s testimony continued, claiming that Mark put the gun up to his own mouth as Hilburn tried to convince him not to kill himself. Hilburn’s testimony then described a scene where Mark turned towards Hilburn with the gun pointed towards Hilburn and cocked the gun. Hilburn tried to reach the door handle as Mark pointed the gun towards his face and allegedly said this would be a better way to do things for Mark and Karen. Hilburn testified that he grabbed Mark’s wrist with one hand and the gun with the other hand and tried to jerk it away.
At this time, the gun went off once and Mark began screaming in pain. Hilburn testified that the gun then went off again. At trial, Hilburn denied ever having his finger on the trigger and testified that he was scared and in fear for his life. Hilburn testi *240 fied that he got out of the car, slammed the door, couldn’t see Mark moving, and tried to open the driver’s side door, but it was locked. He then got on his motorcycle and went to the airport.
Hilburn testified that he took an overdose of Amitriptyline at home. Hilburn claimed that he asked Karen about Mark during their lunch on the 13th and that Karen did not want to talk about it. This was a direct contradiction of Karen’s testimony.
Hilburn tried to allege that the officers were putting words in his mouth and were telling him that Karen was trying to get one of them out of the picture. Hilburn testified that the reason he confessed on the day after the murder was that he didn’t want Karen involved and that the police had intimidated him into making a statement. Hilburn admitted that he was never threatened by any of the officers, however. Hilburn also noted that his mind was clouded from the medication he had taken six or eight hours earlier.
As to the suicide note, Hilburn testified that the note sounded more like his note than Mark’s. This appeared to be the beginning of a theory that Mark had written the suicide note for Hilburn, as part of a plot to murder Hilburn; however, this theory was not pursued. Hilburn testified that he did not shoot Mark Jones.
On cross, Hilburn testified that he had contemplated suicide himself. Hilburn testified that Mark had called him several times trying to arrange a meeting; however, he was unable to tell the prosecutor when these calls were allegedly made. Hilburn did testify that Mark eventually came by the airport and told Hilburn that he needed to talk to him one day where they could be in private with no one around. Hilburn admitted he had reloaded wad-cutters in the past, but allegedly never for himself. Hilburn also testified that Karen had asked him to move out west with her if she got into the management program. Hilburn testified that Mark had contacted him the day before the murder and instructed Hilburn to call Karen the night of the murder when Mark would be there and tell her to bring the Toyota to the airport. Mark was supposed to then either volunteer to take the truck himself or arrange a meeting. Hilburn testified that in any case, Mark was going to tell Karen the time he was leaving so Hilburn would know what time to meet him. Hilburn denied wearing gloves when he went to meet Mark, claiming to have left them in Karen’s truck. He also denied going to the airport around 9:00 or 10:00 that night, which was a direct contradiction of Waters’ testimony. He admitted to having known of Mark’s death when Karen said she wanted to go see him at Wal-Mart. However, Hilburn could not recall whether he told Karen there was no use going at that time. Hilburn claimed that he lied to the police during his initial interview and that any statements he made to the officers contrary to his testimony at trial was a lie at the time that he said it.
Defendant’s first contention is that the trial court erred in refusing to allow the defense witness, JoAnn Williams, to testify as an expert as to the authorship of the alleged suicide note.
The trial court is vested with wide discretion in determining the competence of an expert witness, and the ruling on the qualification of that witness will not be disturbed absent an abuse of that discretion. State v. Trahan, 576 So.2d 1 (La.1990); State v. Washington, 597 So.2d 1084 (La.App. 2d Cir.1992).
Defendant attempted to qualify JoAnn Williams as an expert in “writing pattern analysis.” Williams had not done any writing on the subject, nor could she name anyone who had, nor was she aware that any writing on the subject existed. Williams was also the defense attorney’s aunt, whose only apparent qualification was her experience of 20 years grading essays and themes written by junior high and high school students, eight years before moving from the classroom to an administrative position. The trial court was within its discretion to refuse to qualify Williams as an expert.
Defendant also argues that even if Williams was not qualified as an expert, she should have at least been allowed to testify as to her opinion as to who authored the suicide note.
*241 If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are: (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. LSA-C.E. Art. 701. Comment (c) to Article 701 states that the article
rides in tandem with Article 602 of this Code, and makes it clear that a lay witness, unlike a witness qualified as an expert, may express an opinion or inference only if it is rationally based on things perceived by him firsthand.
Article 602 states, in pertinent part, that,
A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself.
Williams’s personal knowledge of defendant’s writing patterns consisted entirely of her comparison of certain of his handwritten letters to the typed suicide note. She testified she did not know Hilburn, Mark Jones, nor Karen Spaulding. Indeed, Williams was a high school English teacher with significant experience. However, there are obviously any number of similarly situated teachers who could be called to testify on the subject if the testimony of Williams is admissible. We conclude that this is not the sort of evidence contemplated by LSA-C.E. Arts. 602 and 701. The trial court was within its discretion in excluding Williams’s testimony.
Defendant’s second contention is that the evidence, viewed in the light most favorable to the prosecution, fails to exclude other reasonable hypotheses of innocence.
In order to satisfy due process standards, the record evidence, viewed in a light most favorable to the prosecution, must be sufficient for a rational fact finder to conclude that the essential elements of the crime were proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Magouirk, 561 So.2d 801 (La.App. 2d Cir. 1990), writ denied, 566 So.2d 983 (La.1990). Where the conviction is based upon circumstantial evidence, LSA-R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. However, LSA-R.S. 15:438 does not establish a stricter standard of review than the more general rational juror’s reasonable doubt formula. It is merely an evidentiary guide for the jury when considering circumstantial evidence. State v. Kelly, 576 So.2d 111 (La.App. 2d Cir.1991); State v. Heck, 560 So.2d 611 (La. App. 4th Cir.1990), writ denied, 566 So.2d 395 (La.1990).
Second degree murder is defined in LSA-R.S. 14:30.1, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
In this case, there was sufficient evidence from which jurors could have concluded defendant specifically intended to kill Mark Jones. Hilburn admitted to being jealous of Karen and Mark. He told Karen to move her .38 to the Mazda a couple of weeks before the murder. Hilburn arranged a meeting with Mark and knew what time Mark would be leaving Karen’s on the night of the murder. Hilburn had a prepared typewritten suicide letter with him when he met with Mark at Crew Lake. There was significant evidence indicating that Hilburn went to great lengths to disguise the murder as a suicide.
The evidence in this case was sufficient to exclude other reasonable hypotheses of Hil-burn’s innocence. The jury heard Hilburn’s taped statement which he made to the police officers the day after the killing. He admitted typing the suicide note but said that he only did so at Mark’s request. He said that the gun initially went off as he attempted to pull it away from Mark’s temple, but that he then acquiesced in Mark’s request to put him out of his misery. He told the officers where he typed the letter, and the crime lab reported that the letter appeared to have been typed on the typewriter to which Hilburn directed the officers.
At trial, Hilburn’s position had changed. The defense now was that Mark *242 had arranged the meeting and brought the letter. Mark made what Hilburn considered a threatening gesture, and after a struggle, the gun went off, killing Mark. Here on appeal, still a third theory is advanced, i.e., that Karen and, apparently, Mark had planned to kill Hilburn, but the plan went awry. The jury considered all the testimony, including the testimony of the numerous witnesses who testified that Mark Jones was not suicidal, but was on the contrary very happy and excited about his future. Credibility determinations are a matter left to the discretion of the trier of fact. It is not a function of a reviewing court on appeal of a criminal conviction to evaluate the credibility of witnesses. State v. Magouirk, supra.
Viewed in the light most favorable to the prosecution, this evidence supports a rational fact finder’s conclusion that defendant was guilty of every essential element of the crime for which he was convicted.
Defendant’s final contention is that the trial court erred in refusing to grant a mistrial based on the prosecution’s “blatant misstatement of the facts during rebuttal closing arguments.” Defendant’s assignment of error in this respect contends that these misstatements served only to discredit the defendant and defense counsel in the eyes of the jury. While the assignment of error asserts several particulars, the only objection argued to us in brief is the state’s comments made during rebuttal about the intoxication of the victim.
The state and the defense stipulated to the reading of the autopsy report into the record. The report stated, inter alia, that, “He was legally intoxicated with ethanol at the time of death, but there was no evidence of recent abuse of the other common drugs.” During the state’s closing argument, the prosecutor stated:
And you know, he says in this autopsy report that Mark Jones was so intoxicated, ... but isn’t that funny. The defendant took the stand and said he could not tell that Mark had been drinking. He said that he couldn’t tell at all. If Mark Jones were 0.18, he would have been out of his mind. Now the evidence doesn’t show that Mark was drinking. The evidence does show that he was embalmed before he went over there. There is no way that that matters one way or the other....
LSA-C.Cr.P. art. 774 provides in pertinent part:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
While a prosecutor must base his conclusions and deductions upon the evidence adduced at trial under Article 774, both the state and defense are entitled to their own conclusions as to what is established by the evidence and may press upon the jury any view arising out of the evidence. Moreover, a conviction will not be reversed because of improper closing argument, unless the remarks influenced the jury and contributed to the verdict. State v. Mills 505 So.2d 938 (La.App. 2d Cir.1987), writ denied, 508 So.2d 65 (La.1987).
The prosecutor’s comments about the autopsy report and the intoxicated state of the victim were permissible under Article 774. The reading of the report into the record was stipulated to by the state and the defense. The prosecutor was merely arguing as to the lack of any other evidence that could show or support the contention that the victim was intoxicated on the night of his murder. The prosecutor was, therefore, entitled to press upon the jury the conclusion that the blood alcohol present in the victim’s body was not the result of any consumption of alcohol, but rather, the result of embalming.
These comments were the prosecutor’s own conclusions as to what the evidence established. The prosecutor was merely pressing upon the jury a permissible view arising out of the evidence. Thus these comments were proper under Article 774.
Accordingly, the defendant’s conviction is affirmed.
AFFIRMED.