649 So.2d 783 (1995)
STATE of Louisiana, Appellee,
v.
Alvin HARVEY, Appellant.
No. 26613-KA.
Court of Appeal of Louisiana, Second Circuit.
January 25, 1995.
Rehearing Denied February 23, 1995.
*785 Indigent Defender Office by John M. Lawrence and Kurt Goins, Shreveport, for appellant.
Richard Ieyoub, Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Ron Inderbitzen, Catherine Estopinal, Asst. Dist. Attys., Shreveport, for appellee.
Before LINDSAY, WILLIAMS, and CULPEPPER (Pro Tempore), JJ.
LINDSAY, Judge.
The defendant, Alvin Harvey, was convicted of second degree murder, in violation of LSA-R.S. 14:30.1, in the shooting death of his wife. He was sentenced to imprisonment at hard labor for life. He appealed. For the reasons assigned below, we affirm the defendant's conviction and sentence.

FACTS
At about 6 p.m. on August 14, 1993, the defendant, a police officer, shot his wife, Sandra Harvey, in the laundry room of their Shreveport home. Also present in the house were their sons, 13-year-old Alvin Jr. and 10-year-old Alton; however, the children were watching television in another room and did not witness the shooting. After shooting his wife three times, the defendant made three telephone calls. The first call was to his mother-in-law, and the third one was to his own mother. The second call was to the 911 emergency operator. Coincidentally, the operator who initially took the call was Claudia Wade, a woman with whom the defendant had recently had an affair. In fact, it was later determined that the defendant had been at her residence for several hours on the morning of the shooting.
When the police and emergency personnel arrived at the house, they discovered the defendant's wife lying on the floor of the laundry room. A .22 caliber revolver was found under her right armpit. Mrs. Harvey was transported to the hospital, where she was pronounced dead.
The defendant was arrested and informed of his Miranda rights at his home. Thereafter, he was transported to the police station where he gave a statement in which he contended that he shot his wife in self-defense. He stated that he suspected that his wife was having an affair. Consequently, before he began his night patrol shift the evening before the shooting, he had set up a videotape machine to make an audio recording of the sounds in the master bedroom of their home during his absence. However, after he finished his shift in the early morning hours, he did not return home immediately to check the tape. Instead, he went to the home of Ms. Wade, where he remained for several *786 hours. Then he went home to listen to the tape, which supposedly supported his accusations. When his wife and children returned home that afternoon from a shopping excursion, the defendant confronted his wife with his suspicions. During the course of their discussion, they entered the master bedroom and closed the door to the hallway. Access to the laundry room could be obtained through another door in the bedroom.
According to the defendant's statement, he saw his wife, who was right-handed, go from the master bedroom into the laundry room with a .22 calibre pistol in her left hand. The defendant armed himself with his 9mm service weapon, which he concealed in his pants pocket. He then followed his wife into the laundry room where he continued arguing with her and began threatening to take their children away from her. At this point, the defendant said that the .22 caliber pistol was resting on top of some wire shelves next to the washing machine. The defendant maintained that he thought his wife was reaching for the gun, so he removed his service weapon from his pocket and shot her before she could shoot him.
When, at the defendant's request, officers listened to the portions of the audio tape that allegedly confirmed his suspicions that his wife was having an affair, they were unable to discern any such evidence. Furthermore, the results of the autopsy performed on Mrs. Harvey indicated that she could not have been reaching for the .22 caliber handgun when she was shot, as the defendant claimed.
The defendant was indicted for the offense of second degree murder. Following a jury trial, he was convicted as charged. He received the mandatory penalty of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.
The defendant appealed, relying upon 10 assignments of error. However, one assignment was specifically abandoned by the defendant in his brief as being meritless.

EVIDENCE PERTAINING TO CHARACTER
In his first two assignments of error, the defendant complains of a series of questions asked during the direct examination of the defendant's sons.
The following exchange occurred during the testimony of Alvin Jr.:
Q: I am going to ask you, in the house that you were living in, did your dad own more than one gun?
A: Yes.
Q: Did he own several guns?
A: Yes.
Q: Had you seen a number of these guns before?
A: Yes.
Q: Had your dad ever taken you or your brother out to teach you to shoot?
A: Yeah, we shot with it.
Q: Did he ever take your mother along to shoot?
MR. GOINS: Objection, Your Honor. May we approach?
THE COURT: Yes.
(Whereupon a discussion off the record was held.)
THE COURT: All right. The objection is overruled.
MR. GOINS: Your Honor, note our objection for the record, under Article 404 of the Code of Evidence, out of abundance of caution.
THE COURT: It is so noted.
MR. GOINS: Thank you.
THE COURT: Go ahead, Mr. Inderbitzen.
BY MR. INDERBITZEN:
Q: At any of these times that mother had been with you, did she ever shoot a gun?
A: No.
Q: Did you ever see her hold a gun or did he ever teach her how to shoot that you know of?
A: No.
The state pursued a similar line of questioning during Alton's testimony:
Q: Did you ever see any guns in the house?
A: Yes.
Q: Did your dad own guns?
A: Yes.

*787 Q: Do you know how many he owned?
A: No.
Q: Did your mom own a gun or ever have a gun that you are aware of?
MR. GOINS: Your Honor, quickly, I want to make the the [sic] same objection as I did earlier.
THE COURT: Overruled. Try Article 406.
MR. GOINS: Thank you. Note my objection, Your Honor.
THE COURT: Go ahead.
BY MR. INDERBITZEN:
Q: Did she own any guns?
A: No.
Q: Did you ever see her with one?
A: No.
On appeal, the defendant argues that the trial court's admission of the testimony was a violation of LSA-C.E. Art. 404(A) because it attacked his good character and credibility.[1] He claims that the evidence caused the jury to disregard his statements that the shooting was in self-defense. He also cites LSA-C.E. Art. 607, arguing that the evidence was used to attack his credibility prior to his presenting any evidence of good character or credibility.[2]
Both of defendant's objections were made after questions about the victim's knowledge and use of guns. It is apparent that the testimony was solicited to show that she did not regularly carry or use a handgun. Prior to the children's testimony, Officer Dwight Martin of the Shreveport Police Department testified, without objection from the defendant, that Mrs. Harvey's body was found with a .22 pistol under her armpit. Also, Officer Martin had testified that another gun, a 9mm Glock handgun issued by the Shreveport Police Department, was found in the master bedroom. In overruling the objection during Alton's testimony, the trial court relied upon LSA-C.E. Art. 406.[3]
The central issue of this case was whether the defendant shot his wife in self-defense. Even though the defendant's statement claiming self-defense had not yet been admitted when his sons testified, the jury was well aware of this claim from the defendant's opening statement. Therefore, the question of whether Mrs. Harvey owned or routinely used a gun was highly relevant. The state did not use the testimony of the sons to show that defendant had bad character, but instead to begin laying the foundation for showing the shooting was not in self-defense. When a defendant asserts self-defense in a homicide case, the state has the affirmative duty of proving beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Cotton, 25940 (La.App. 2d Cir. 3/30/94), 634 So.2d 937.
*788 Furthermore, the defendant cannot rely upon LSA-C.E. Art. 607 on appeal since he did not do so at the time he made his objection. A new basis for an objection cannot be raised for the first time on appeal. State v. Cressy, 440 So.2d 141 (La.1983); State v. O'Neal, 501 So.2d 920, 924 (La.App. 2d Cir.1987), writ denied, 505 So.2d 1139 (La.1987); LSA-C.Cr.P. Art. 841.
This assignment is without merit.

COMPUTER-GENERATED ANIMATIONS OF THE CRIME
The defendant also contends that the trial court erred in admitting into evidence computer-generated, still animations depicting the shooting incident and the placement of the victim's body, specifically exhibits # S-8, # S-30, # S-31, and # S-32.
Officer Martin testified that exhibit # S-8 accurately depicted the position of Mrs. Harvey's body in relation to the clothes dryer and freezer in the laundry room. This animation also contained a red "X" which, according to Officer Martin, accurately showed where the .22 pistol was found. Dr. George McCormick, the coroner of Caddo Parish, testified that the other animations (# S-30, # S-31, and # S-32) depicted his conclusions as to the sequence of the three shots fired at Mrs. Harvey.
Outside the presence of the jury, defendant objected that the animations could be inflammatory. He argued that by admitting these exhibits, the state was introducing into evidence Dr. McCormick's conclusion itself of how the incident occurred. The state argued that the animations illustrated the positions of the victim and the defendant and the path of the bullets. Further, there was no blood depicted. After determining that the animations were demonstrative of Dr. McCormick's testimony, the trial court overruled the defendant's objection and admitted the animations.
The defendant now raises the same arguments on appeal, citing LSA-C.E. Art. 403 for the premise that, although the animations may be relevant, their probative value was outweighed by their prejudicial effect on the jury. He also contends, for the first time on appeal, that the animations were cumulative because Dr. McCormick's testimony, autopsy photographs, and autopsy report were sufficient to illustrate to the jury the state's argument about how the incident occurred.
The Louisiana Supreme Court has held in regards to a reenactment that "`[t]he probative value of such an experiment or reconstructed evidence depends in large measure upon the extent to which the reconstructed scene was identical to or similar to that which existed at the time the incident happened.'" State v. Trahan, 576 So.2d 1, 7 (La.1990), quoting State v. Boyer, 406 So.2d 143 (La.1981). The court in Trahan further noted that "while a recreation need not be exact in every detail, the important elements of the test must be identical or very similar to the scene in order to have probative value." In the Trahan case, the court found that the video reenactment of the defendant's version of how a portion of the incident occurred was inadmissible because it was not supported by the defendant's testimony.
In State v. Video Joe, Inc., 578 So.2d 182 (La.App. 1st Cir.1991), the court held that "[d]iagrams are admissible to aid the jury in understanding testimony if they are a reasonable visual demonstration of the events which the witnesses are relating. The trial court's ruling on the admissibility of a diagram will not be disturbed on appeal unless there has been an abuse of discretion. [Citations omitted.]" 578 So.2d at 187. The court in that case held that the state's diagram of the interior of defendant's store was properly admitted at trial, noting that "inaccuracies of the diagram go to the weight to be accorded to the sketch but not to defeat its admissibility."
Finally, this court has held that "photographs are admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing, or place depicted." State v. Perow, 616 So.2d 1336 (La.App. 2d Cir.1993), writ denied, 623 So.2d 1303 (La.1993).
We find that the trial court did not err in admitting the animations into evidence. Dr. McCormick, who conducted the autopsy *789 on the victim, was qualified as an expert witness in forensic pathology. He concluded that the first shot went through the victim's right elbow as she was turning, which twisted her to the side; that bullet then reentered the right side of her abdomen and exited her right lower back. The second shot entered her left breast and again turned her to the side. The third shot was fired at extremely close range (within inches) and grazed her right hand before striking her in the middle of the chest. According to the coroner, the downward angle of the last two bullets indicated that she was either bent over or on her knees when they were fired. Dr. McCormick testified that, in his opinion, the victim was not holding anything in her right hand when she was shot and that it was impossible for her to have been reaching for a gun at that time.
Dr. McCormick then testified that the animations # S-30, # S-31, and # S-32 depicted his opinion as to the respective sequence of the shots in relation to the position of the shooter and victim. He also noted that # S-8 depicted a possible position of the victim's body after the shooting; as already mentioned, Officer Martin testified that this animation accurately reflected the position of the victim's body when he arrived at the Harvey home shortly after the shooting.
Furthermore, Dr. McCormick testified on cross-examination that there were other possible scenarios as to the order of the shots, but that the animations were indicative of the "most conservative" scenario. Thus, the animations had strong probative value, providing a visual demonstration of the shooting as described by Dr. McCormick. The jury was aware that the coroner did not witness the shooting and that his testimony was based upon the autopsy and tests he performed; certainly, the jury could weigh this factor when considering the animations.
As to the cumulative nature of the animations, this argument was not raised by defendant at the time his objection was made. As previously stated, a new basis for an objection cannot be raised for the first time on appeal. Cressy, supra; O'Neal, supra; and LSA-C.Cr.P. Art. 841. Further, the animations were not merely cumulative of Dr. McCormick's testimony, autopsy report, and autopsy pictures. The animations illustrated Dr. McCormick's version of how the shooting most likely occurred. Thus, they enhanced the jury's understanding of the autopsy report and pictures as to the direction of the bullets and the position of the shooter. See State v. Fleming, 593 So.2d 1298, 1300 (La.App. 1st Cir.1991); State v. Owens, 567 So.2d 806, 810 (La.App. 3d Cir. 1990).
Thus, this assignment is without merit.

REQUESTED JURY CHARGE ON RETREAT
In his next assignment of error, the defendant argues that the trial court erred in refusing to give his special requested jury charge on the issue of retreat. Specifically, the defendant requested that the jury be instructed that there is no unqualified duty to retreat from an encounter.
The trial court judge refused to give the defendant's special charge because he believed the court's instruction adequately addressed the issue of retreat. In pertinent part, the trial court's jury instructions regarding self-defense stated:
A homicide is justifiable if committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from danger. The danger need not have been real as long as the defendant reasonably believed that he was in actual danger.
The factors that you should consider in determining whether the defendant had a reasonable belief that the killing was necessary are: one, the possibility of avoiding the necessity of taking a human life by retreat; two, the excitement and confusion of the occasion; three, the possibility of preventing the danger to himself by using force less than killing; and four, the defendant's knowledge of his assailant's dangerous character. Thus if you find, one, the defendant killed in self-defense and the defendant believed that he was in danger of losing his life or receiving great bodily *790 harm and that the defendant believed the killing was necessary to save himself from that danger and, four, the defendant's belief [sic] were reasonable in light of the circumstances, then you must find the defendant not guilty.
A defendant who raises the defense that he acted in self-defense does not have the burden of proof on that issue. The State must prove beyond a reasonable doubt that the homicide was not committed in self-defense.
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
(Emphasis added).
In relevant part, LSA-C.Cr.P. Art. 807 states:
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
In State v. Lee, 498 So.2d 1177 (La.App. 3d Cir.1986), writ denied, 504 So.2d 874 (La. 1987), the court addressed an almost identical situation. The defendant in the Lee case was denied a requested jury instruction that said in part, "there is not an unqualified duty to retreat...." The trial court instead gave an instruction virtually identical to the one given in the case at bar, including that one factor to consider was "the possibility of avoiding the necessity of taking human life by retreat." In finding that the trial court did not err in refusing to give the special charge, the court stated:
It is well settled that requested charges which are already substantially given and covered by the trial court's general charge are properly refused. LSA-C.Cr.P. art. 807; State v. Matthews, 380 So.2d 43 (La. 1980). The trial court's given charge defined `justifiable homicide' sufficiently to inform the jury that the possibility of retreat is only a factor to be considered and not an absolute duty on the part of the defendant. The trial court was, therefore, not required to give the defendant's requested charge which was essentially to the same effect.
498 So.2d at 1180.
A trial court is not required to give a requested special charge that is included in the court's general charges. See State v. Thomas, 609 So.2d 1078, 1082 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La. 1993); State v. Washington, 597 So.2d 1084, 1088 (La.App. 2d Cir.1992); and State v. Honeyman, 565 So.2d 961, 969 (La.App. 2d Cir.1990).
The issue of retreat raised in the requested instruction was adequately addressed in the thorough instructions given by the trial court. Finally, as the state noted in its brief, defense counsel conceded in closing argument that defendant's self-defense argument was futile.[4]
This assignment has no merit.

GENERAL JURY CHARGE
In this assignment of error, the defendant alleges the trial court used a misleading definition of manslaughter in its jury charge, which provided the jury with another way to convict the defendant of second degree murder.
Instead of exactly duplicating the language of LSA-R.S. 14:31 by beginning the definition with "manslaughter is a homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder)," the trial court stated that "manslaughter is the killing of a human being when the defendant has a specific intent to kill or to inflict great bodily harm," followed by the qualifying language concerning "sudden passion or heat of blood." Basically, *791 in an effort to avoid confusing the jury, the trial court removed the references to the statute numbers and utilized the definition of the only type of second degree murder applicable to the present case, i.e., LSA-R.S. 14:30.1(A)(1). The trial court deleted any reference to first degree murder and the other forms of second degree murder enumerated in LSA-R.S. 14:30.1 because they were inapplicable under the facts of this case. We also note that the manslaughter definition used by the trial court is the same one found in § 10.10 of the Louisiana Judges' Bench Book, Vol. II, Jury Instructions Criminal (1994).
Before the jury was charged, the defendant objected to the definition and now claims the use of the definition was misleading to the jury. On appeal, he argues it allowed the jury to convict the defendant of second degree murder if it found "specific intent to kill or inflict great bodily harm" regardless of the qualifying "but the killing is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."
The defendant has not cited any authority in support of his argument. The contested definition of manslaughter that was given was followed with the qualification as to "sudden passion or heat of blood." However, the definition of second degree murder included the language "with specific intent to kill or to inflict great bodily harm" without any qualifying terminology as to "sudden passion or heat of blood." It is difficult to believe that the jury could have been misled to the extent of confusing the two definitions as the defendant claims. The record shows each definition was clearly presented and distinguished. Furthermore, in closing arguments, defense counsel clearly distinguished between the two offenses while arguing that the present offense was committed "in the heat of passion."
This court has held that:
A jury charge must be considered as a whole, and particular expressions in a charge must be construed in context of the entire charge. A conviction will not be reversed on the ground of an erroneous charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial.
State v. Daniels, 614 So.2d 97, 113 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La. 1993). Defendant has failed to show how the disputed definition was either erroneous or prejudicial, especially in the context of the complete charge.
This assignment is without merit.

SCOPE OF STATE'S CLOSING ARGUMENT
The defendant contends that certain remarks made by the state during closing argument were prejudicial and inflammatory. As a result, the defendant argues that the trial court committed reversible error by overruling his objection to the remarks. During closing argument, the prosecutor stated:
Ladies, when you left yesterday and walked to your car, did you each maybe hold your purse a little bit closer when you saw a bedraggled-looking man standing on the corner?
Men, you get your families ready to go on a family vacation
MR. GOINS: Objection, Your Honor. He is going a little beyond the scope of the evidence.
MR. HOLLAND: This is argument, Your Honor.
MR. GOINS: Argument has limits, Your Honor.
THE COURT: Overruled.
MR. GOINS: Note my objection.
MR. HOLLAND: When you get ready to go on the family vacation, do you sometimes think about taking a firearm with you just in case? Why is that? It is because the outside world in the 1990's is a dangerous place. It is not the 1950's anymore. You can't sleep with your windows up and your doors unlocked. But there is one place you always figure that you can go without having to worry about the violence associated with the street, and that is the place where your children sit and play *792 with their toys and you sit around a table at Christmas and holding hands with your husband or your wife and your kids and family and you cut the Christmas turkey and you say grace. And that is the one place where you can feel the safest. That is the one place where your sensitivity is the highest and that is the one place where you know that you are home. And it makes you feel doubly safe if your spouse is a police officer. Sandra Harvey couldn't feel that way.
Go back to the jury room and write the last chapter of this play. Don't let the last chapter be, I believe Alvin Harvey's story and I'm going to let him go.
The Louisiana Supreme Court discussed the parameters of closing argument in State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989), reh. denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989). In Eaton, the court held that pursuant to LSA-C.Cr.P. Art. 774, closing argument is limited to the evidence admitted, to the lack of evidence, to conclusions of fact which may be drawn therefrom and to the law applicable to the case. However, an appellate court should not reverse on grounds of improper closing argument unless it is thoroughly convinced the remark influenced the jury and contributed to its verdict. In making this decision, credit should be given to the jury's good sense and fairmindedness. 524 So.2d at 1208.
The record does not support the defendant's claim that the statement complained of influenced the jury in convicting him. In considering the statement in the context of almost 40 pages of closing argument, it alone is not so persuasive as to have caused the jury to convict the defendant of second degree murder. Furthermore, there was a significant amount of testimony from the state's witnesses to support the jury's verdict.
This assignment is without merit.

EVIDENCE BASED ON SPECULATION
In the defendant's next assignment of error, he argues the trial court erred in allowing Detective Brian Strange of the Shreveport Police Department to give the following testimony:
Q: Do you have any personal knowledge of how long it took Mr. Harvey to raise that particular bond before he was released?
A: It wasn't long, because after I heard the bail had been set, then I also heard that Harvey had also gotten out of jail on that bond.
Q: Okay. So he was in jail for a period of time, correct?
A: That is correct.
Q: Did you come across the information that he was out of jail before you executed the search warrant?
A: That is correct.
Q: So it is possible that he had access to the house before the warrant was executed?
MR. GOINS: Objection, Your Honor. That is nothing more than speculation.
THE COURT: Overruled.
MR. GOINS: Note my objection.
THE WITNESS: That is correct.
BY MR. HOLLAND:
Q: Now, based on what you just testified to, based on the fact that you have already testified that we had a tape made from the recorder under the bed?
A: Correct.
Q: And based on the fact that the recorder was not found when you executed the warrant, did you form an impression as to whether Officer Harvey had been back to the residence?
A: Yes, sir.
Q: And that impression was?
A: That he came back to the residence and got the recorder and left the dual phone jack in the phone receptical [sic] under the bed.
The defendant argues that this testimony should have been excluded under LSA-C.E. Art. 701 because Detective Strange did not have first hand or substantive knowledge that the defendant had returned home and tampered with evidence. Further, he contends *793 that the testimony was evidence related to another offense for which he was not on trial and thus should have been excluded under Prieur, absent the proper safeguards.
Prior to Detective Strange's testimony, the victim's brother, the Reverend Earnest Green, testified that on the Tuesday following the shooting on Saturday, he went to the Harvey home. Mr. Green had the responsibility of attending to the final affairs of his sister and consequently needed to get an insurance policy from the home. The defendant had informed him that the insurance policy was underneath the bed in the master bedroom. While looking under the bed, Mr. Green stated that he discovered a tape recorder connected to the telephone line. He took the cassette tape that was inside the recorder and then put the tape recorder itself back under the bed. He later listened to the cassette tape, made a copy for himself, and then gave the original tape cassette to his family's attorney to deliver to the district attorney's office. The tape contained recordings of the three phone calls made by the defendant immediately after the shooting. As previously mentioned, the first call was to the mother of Mr. Green and the victim. The second call was to the 911 emergency system, and the final call was to the defendant's mother. At the time Mr. Green found the tape cassette and recorder, the defendant had not yet been released from jail on bond.
The state argues in brief that the testimony by Detective Strange was rationally based on his perception from the sequence of events. The police knew from Mr. Green that the tape recorder was underneath the bed. However, when the search warrant was executed, the tape recorder was missing. Detective Strange saw that there was a telephone jack with two sockets which he knew from investigation experience was needed to record telephone calls. Further, he was aware that defendant had been released from jail on bond before the warrant was executed. Therefore, the state contends that Detective Strange's testimony showed defendant's consciousness of guilt because he concealed evidence of the contrasting emotional states of the three telephone conversations on the tape.
LSA-C.E. Art. 701 states:
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.
In State v. Lowery, 609 So.2d 1125, 1128 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993), this court held that a law officer may testify as to matters within his personal knowledge acquired through experience without being qualified as an expert witness. Also, in State v. Hicks, 607 So.2d 937, 945 (La.App. 2d Cir.1992), we noted that a lay witness may testify based upon a natural inference from observed facts. In such an instance, the witness should state the observed facts upon which the inference was based.
Detective Strange's testimony about the removal of the tape recorder was a natural inference from observed facts. At the beginning of his testimony, the officer stated that he had been a homicide detective for two and one-half years and had been involved in about 130 homicide investigations. Detective Strange admitted he had no personal knowledge as to whether the defendant had returned home after his release. When the state asked the detective if he had an opinion as to whether the defendant had returned to the house after being released on bond, the trial court sustained the defendant's objection and instructed the state to lay a better foundation.
The state then elicited testimony from Detective Strange about the bond procedure, as well as his knowledge that the defendant had been released from jail before the execution of the search warrant. He then confirmed that he knew about the cassette tape removed from the tape recorder by Mr. Green and that the tape recorder itself was not found upon execution of the warrant. As a result of all of these factors, he inferred that *794 the defendant had returned home and removed the tape recorder. These factors are sufficient to support such an inference.
As to the defendant's argument of a Prieur violation, it is noted that the defendant did not raise such an argument at the time his objection was made. Instead, he objected on grounds of speculation and did not make another objection at the time Detective Strange relayed his opinion regarding the defendant's removal of the tape recorder. Once again, the defendant is raising a new basis for an objection for the first time on appeal, which this court does not permit. Cressy, supra; O'Neal, supra, and LSA-C.Cr.P. Art. 841. Even if this argument were to be considered, it has no merit. As the state pointed out in its brief, Detective Strange did not mention any specific criminal act.
This assignment has no merit.

MOTION FOR NEW TRIAL
In this assignment of error, the defendant contends the trial court erred in denying his motion for a new trial. The motion presented four arguments as a basis for a new trial, three of which are addressed in other assignments of error. Thus, the discussion in this particular assignment of error is limited to the introduction of color autopsy photographs instead of black and white photographs as a basis for a new trial.
Prior to the beginning of trial, defendant filed a motion in limine on November 29, 1993, to prohibit the state from using color autopsy photographs of the victim and to substitute black and white pictures. The record submitted on appeal contains neither a ruling on this motion nor a transcript from the hearing on the motion. However, the court minutes state that the motion in limine filed on November 29, 1993, was denied.
At the time the pictures were introduced into evidence at trial, the defendant specifically stated he would not object to their admission. However, LSA-C.Cr.P. Art. 841(B) states that the requirement of a contemporaneous objection to preserve a trial error for appellate review does not apply to the trial court's ruling on any written motion. State v. Walters, 25587 (La.App. 2d Cir. 01/19/94), 630 So.2d 1371; State v. Sammon, 582 So.2d 360 (La.App. 2d Cir.1991). Therefore, although the defendant did not object at trial, his motion in limine preserved this argument for appeal.
The color photographs complained of were admitted during the testimony of Dr. McCormick. Photographs # S-14, # S-15, # S-16, # S-18 and # S-20 were taken by the police at the hospital and depicted the body as it appeared when Dr. McCormick received it. Photographs # S-17, # S-19, # S-21 and # S-22 were taken under Dr. McCormick's direction during the autopsy. The photographs show entrance wounds, exit wounds or stippling.
The defendant concedes that the photographs had probative value. Instead, his argument is based upon the photographs being in color and thus prejudicial. Defendant has not cited any cases which stand for the premise that black and white photographs should be used instead of color.
In State v. Bourque, 622 So.2d 198 (La. 1993), the court held that the trial court did not err in admitting post-mortem and autopsy color photographs at trial. The trial court had noted that some of the pictures were gruesome but found that the probative valued outweighed their prejudicial effect. The Louisiana Supreme Court agreed, stating that such photographs were admissible for reasons including "to corroborate other evidence establishing the cause of death, the manner in which death occurred, and the location, severity and number of wounds." 622 So.2d at 236. The court then referred to other cases where the admission of color photographs was upheld. See State v. Perry, 502 So.2d 543, 558-59 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987), reh. denied, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987); State v. Copeland, 530 So.2d 526, 542-43 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989), reh. denied, 490 U.S. 1077, 109 S.Ct. 2092, 104 L.Ed.2d 655 (1989). Also, in State v. Gallow, 338 So.2d 920 (La. 1976), the Louisiana Supreme Court noted that the fact that the photographs in question *795 were in color did not of itself make them inadmissible.
The standard for overturning the admission of gruesome photographs requires their prejudicial effect to outweigh their probative value. Further, photographs are not "admitted in error unless they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence." Copeland, 530 So.2d at 543.
The trial court did not err in denying defendant's motion for new trial based upon the admission of the color photographs. The state argues, and the defendant agrees, that the pictures were relevant. The color aspect does not raise the level of prejudicial effect to overcome their probative value. Additionally, we find that the photos, while unpleasant, were not gruesome.
This assignment has no merit.

MOTION IN LIMINE PERTAINING TO EVIDENCE OF DEFENDANT'S ADULTERY
In his final assignment, the defendant initially contends that the trial court erred in not granting his motion in limine as to evidence of other crimes and bad acts, i.e., his adulterous relationship with Claudia Wade, the 911 emergency operator. He then argues that the trial court erred in allowing Ms. Wade to testify at trial beyond the scope of the court's previous ruling at the motion in limine.
On November 4, 1993, the defendant filed a motion in limine seeking to exclude evidence of his adulterous relationship with Claudia Wade, including pictures he had taken of Ms. Wade depicting her nude or semi-nude. A hearing was held on the motion, and Ms. Wade gave lengthy testimony as to her relationship with the defendant. She stated that she and the defendant began their affair in April or May of 1992. In April 1993, Ms. Wade briefly moved into an apartment obtained by the defendant, but she only remained for five weeks because of his jealous suspicions. The defendant asked her to leave after confronting her with a videotape (sound only) he had made of her, allegedly with another man. She testified that they later decided to remain platonic friends, although she admitted that they had sexual relations once in June 1993.
At the conclusion of the hearing, the trial court made several rulings. Testimony regarding the 911 telephone call in which Ms. Wade was the operator and the 911 tape itself were found to be admissible. The trial court ordered that the nude photographs of Ms. Wade be sealed and that no reference be made to them or the videotape involving Ms. Wade. Since Ms. Wade testified that her relationship with the defendant at the time of the shooting was not romantic, the court ruled that evidence of the relationship was not independently relevant to show motive and was deemed inadmissible as part of the state's case in chief. However, the court held that evidence of the adulterous relationship could become admissible at trial if the state could show independent relevance and lay a proper foundation.
The defendant's contention that the trial court erred in not granting his motion in limine is incorrect. As previously noted, the motion was granted in part and denied in part. While finding that testimony of the adulterous relationship was inadmissible to prove motive, the trial court "left the door open" to allow the state to show independent relevance of the evidence. As to the defendant's contention that the trial court allowed Ms. Wade to testify beyond the scope of its ruling on the motion in limine, we find that this is also incorrect. No reference was made to either the nude photographs or the sound recording the defendant made of Ms. Wade. Further, the state did not question Ms. Wade about the sexual nature of her relationship with the defendant but limited its question to what occurred on the day of the shooting.[5] In fact, we note that the first *796 mention of the defendant's adultery came from defense counsel during his opening statement when he stated: "You may learn that Alvin Harvey himself as well engaged in an act of adultery or a series of acts of adultery."
The testimony elicited from Ms. Wade by the state was independently relevant to prove the charge of second degree murder and to discount the defendant's claim of self-defense or manslaughter. The defendant had supposedly set up a video recorder to catch his wife with another man; however, after his shift ended, he spent five hours at Ms. Wade's house instead of immediately returning home to examine the tape. This information tended to support the state's theory, as presented in its rebuttal closing argument, that the defendant set up the recording device in advance of the shooting as part of an "elaborate [ruse,] setup" in order to "give him an out" after he carried out the cold-blooded murder of his wife.
This assignment is without merit.

ERROR PATENT
The record shows that the trial court judge incorrectly informed the defendant of the prescriptive period for post-conviction relief. The judge stated that defendant had "three years to file for post-conviction relief." The correct prescriptive period is "three years after the judgement of conviction and sentence has become final under provisions of Article 914 or 922." LSA-C.Cr.P. Art. 930.8. The trial court is directed to inform the defendant of the correct provisions of this article by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of these proceedings.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.

APPLICATION FOR REHEARING
Before SEXTON, LINDSAY, HIGHTOWER and WILLIAMS, JJ., and CULPEPPER, J. Pro Tem.
Rehearing denied.
NOTES
[1] LSA-C.E. Art. 404 provides, in pertinent part:

A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(1) Character of accused. Evidence of a pertinent trait of his character, such as a moral quality, offered by an accused, or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.
(2) Character of victim.... (b) Evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;...
[2] LSA-C.E. Art. 607 provides, in relevant part, as follows:

A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
[3] LSA-C.E. Art. 406 states:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
[4] During closing argument, defense counsel stated: "I must be blunt now. The facts straddle more to manslaughter than to self-defense. That is why I'm going to spend all my time on manslaughter." He later argued: "On the facts and evidence you have heard in this case, I submit that your verdict should be guilty of manslaughter."
[5] During Ms. Wade's testimony, the defendant objected twice. When the state asked her why she said, "Harvey, no. Harvey, no" after recognizing the defendant's voice during the 911 call, the defendant objected to the relevance of this testimony. The objection was overruled, and Ms. Wade answered that she made this statement "[b]ecause it was a friend and I knew that it was a fellow police officer."

The defendant also objected on grounds of relevancy when the state asked Ms. Wade if she had seen defendant the day of the shooting. The trial court overruled the objection, and Ms. Wade testified that defendant came to her house at her request the morning of the shooting after finishing his graveyard shift. He arrived at about 7:30 a.m. and stayed until 1:00 p.m. She testified that defendant slept most of the time and never mentioned anything to her about the tape recorder he had set up at his house. The defendant chose not to cross-examine Ms. Wade.