998 So.2d 322 (2008)
STATE of Louisiana, Appellee
v.
Candice MALONE, Appellant.
No. 43,548-KA.
Court of Appeal of Louisiana, Second Circuit.
November 19, 2008.
Rehearing Denied January 8, 2009.
*324 Marilyn Michele Fournet, for Appellant.
John Schuyler Marvin, District Attorney, John Michael Lawrence, C. Sherburne Sentell, III, Assistant District Attorneys, for Appellee.
Before BROWN, GASKINS and DREW, JJ.
BROWN, Chief Judge.
Defendant, Candice Malone, was convicted of second degree murder in violation of La. R.S. 14:30.1. She was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant now appeals, primarily claiming that she shot her boyfriend in self-defense. We affirm.

Facts
Around noon on Sunday, March 4, 2007, defendant shot her boyfriend, Terrance Henderson, in the bedroom of his apartment in Springhill, Louisiana. The bullet struck the victim on the right side of his head through his ear. He died where he fell. Henderson's cousin, Jaroid Robinson, was waiting in the living room to take Henderson to get cigarettes. Defendant and Henderson had lived together about six months at the time of the shooting. They had an argument the night prior to the shooting. The victim told defendant to pack and leave. Henderson slept on the couch in the living room. Later that morning, while defendant was packing her things to leave, the shooting occurred.
A grand jury indictment charged defendant with second degree murder, a violation of La. R.S. 14:30.1. At trial a jury voted 10-2 to convict as charged.

Testimony
Jennifer Ray, Terrance Henderson's mother, testified that at midnight prior to the shooting, her son called her, and she could hear defendant arguing with him in the background.
Chelsy Tyson, a neighbor who lived in the next apartment, testified that a week before the shooting she heard Henderson tell defendant, "I'm not going to hit you. Put the gun down." Tyson also stated that at 2:00 a.m. on the morning of the incident, she could hear defendant and Henderson arguing.
Calvin Ray, the "step-cousin" of the victim, testified that he spent the night at Henderson's apartment a week before the shooting and witnessed an argument which ended up with defendant in bed on top of Henderson with a knife to his throat saying how much she wanted to kill him. Ray stated that he was so upset by this event that he called his uncle and told him about the incident. He described the knife that defendant held to the victim's throat and identified one of the knives later found under the bed as of the same type.
Dr. Frank Peretti, the forensic pathologist who performed the autopsy of Henderson, testified that the cause of death was a single gunshot wound to the head. Dr. Peretti stated that the wound was an intermediate contact type, fired from six to twelve inches from the victim. According to Dr. Peretti, Henderson's head was turned away from the shooter when he was shot, and the bullet went *325 through the right ear. Dr. Peretti found no signs of a struggle.
Officer Tommy Edwards, the crime scene photographer and first Springhill police officer on the crime scene, testified that he was stopped by Jaroid Robinson who was holding a loaded 9mm handgun in the middle of the street and saying, "That bitch shot him." Officer Edwards found Henderson's body on the floor next to the bed, a spent bullet casing on the bed, slashed pillows in the bedroom, hot water in the bathtub, luggage on the bed stuffed with women's clothing, and a head-sized hole in the sheet-rock wall of the living room. The officer also saw pennies scattered over the floor in the living room.
Officer Edwards explained the process of loading a magazine into the 9mm pistol and how it operated. He also showed how a bullet casing is ejected after firing. Officer Edwards testified that the 9mm gun was equipped with two safety mechanisms, a "hard" trigger and a "magazine disconnect."
Detective Dexter Turner also examined the crime scene on the day of the shooting. He testified that he found knives under the bed and a Ziploc bag filled with water. Det. Turner noted bruises under defendant's right eye. He stated that fingerprint analysis was not done on the handgun.
Sergeant Donald Coleman, another officer dispatched to the apartment the day of the incident, testified that he arrested defendant, that her demeanor was calm, and during an interview later that day, she was unremorseful. According to Sgt. Coleman, a fingerprint analysis was not done on the knives found underneath the bed.
Jaroid Robinson, Henderson's cousin, testified that he arrived at the apartment the morning of the incident to visit his cousin. He talked to Henderson in the living room while defendant was in the bedroom packing. Henderson told Robinson that he had gotten into a fight with defendant earlier that morning and had slept on the couch. Henderson said that defendant had hit him in the back with a handgun, and he showed Robinson bruises on his hands and back from the attack. Robinson testified that he was asked by Henderson for a ride to the store to get cigarettes. Henderson went to the bedroom to get a jar of change. As Henderson was leaving the bedroom, Robinson saw shadows which he interpreted as defendant hitting Henderson in the back with a handgun. Robinson testified that he heard defendant state that she hit Henderson because it made her feel better. Henderson then set the penny jar on a table in the living room and went back into the bedroom. Robinson noticed from the bedroom door a silhouette of Malone holding a gun to Henderson's right ear, heard the "click" of a gun cock, and then heard a gunshot. Malone came from the back bedroom with the 9mm pistol in her hand, telling Robinson, "I messed up." Robinson said that he took the gun from defendant, unloaded it, reloaded it, and then unloaded it again before placing the weapon on the hood of his car to wait for the police. Robinson testified that he was upset and had thought about killing Malone. He also stated that he had observed defendant load and shoot the gun a month before the incident.
Various relatives and friends then testified on behalf of defendant, including Malone's mother and father, Shanda Malone and Rev. Raymond Malone, Jr., who took pictures of defendant five days after she was arrested for the incident.
Defendant, Candice Malone, testified that she and Henderson had lived together for six months, during which time he was abusive to her, including choking her, cutting *326 her on the hand, cutting her on the neck with scissors, and hitting her. She only told her best friend about the abuse. Defendant testified that she had never handled a gun (except a BB gun) and did not know how to shoot the gun; however, on cross-examination she admitted that she had loaded and unloaded the weapon on a number of occasions. Defendant stated that on the night before the incident, Henderson had gotten mad at her because she would not let him use her car. She and Henderson got into a fight and the penny jar was knocked over. She called Henderson's mother and told her that they were fighting. Henderson went to the car and got the 9mm handgun and returned to the house, at which time they got into another argument. She claimed that Henderson punched and choked her. She grabbed the handgun and hit Henderson in the chest and shoulder. After the fight, defendant hid the handgun in her bedroom closet. She put some ice into a Ziploc bag for her facial bruises.
According to defendant, that morning she was in her bedroom packing to leave when she heard the two men (Henderson and his cousin) talking about her. Defendant testified that she thought they would kill her, so she removed the handgun from the closet and was going to give it to the police. When Henderson came into the bedroom to get his wallet, he saw the handgun on the bed, looked at her "devilishly" and reached for the weapon. She grabbed it first, and they began to struggle over the gun. During the struggle, the gun fired, and she noticed the victim cowering on the floor, bleeding. She ran to the living room, put down the handgun, and ran outside to call 911. According to defendant, she and Henderson fought physically every other day, and the hole in the wall occurred during a previous fight when Henderson slammed her head into the wall.
In contradiction to defendant's trial testimony, the following recorded evidence was presented: 1) when defendant telephoned 911, she stated that an "accidental" shooting had occurred; 2) at the police station in defendant's first statement, she was evasive and unresponsive (at trial she explained that she was traumatized); and 3) in a second interview, she eventually gave more details including that Henderson did not want her there anymore and that she was mad and hit him with the gun. As to the actual shooting, defendant said that the gun wasn't supposed to go off and that she did not know what the victim was doing at the time of the shooting.

Sufficiency
Our law on sufficiency of the evidence is well settled. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/04/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. *327 Gilliam, 36,118 (La.App. 2d Cir.08/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
As it relates to this case, second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1.
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that she is in imminent danger of losing her life or receiving great bodily harm and that deadly force is necessary to save her life. La. R.S. 14:20(A)(1); State v. Dooley, 38,763 (La.App. 2d Cir.09/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.02/18/05), 896 So.2d 30. When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. D.P.B., 02-1742 (La.05/20/03), 846 So.2d 753. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985).
This was a jury decision. In defendant's 911 call and the video taped statements to the police, self-defense was not specifically mentioned in relation to the homicide. In addition, Dr. Peretti's testimony showed that the victim was turned away from defendant when he was shot. As to Jaroid Robinson's testimony, the jury was in a better position to weigh its credibility and could have believed or not believed all or part of the testimony. The physical evidence corroborates much of Robinson's testimony. We cannot say that the evidence was insufficient for a reasonable juror to have rejected justification and found guilt on the part of defendant.

Unanimous Verdict
Defendant argues that a less than unanimous jury verdict violates a defendant's federal and state constitutional right to a jury trial. She cites Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), where she claims the United States Supreme Court in a plurality opinion did not definitively resolve the issue and that more recent cases have called into question the viability of a less than unanimous jury verdict. Louisiana, however, has upheld non-unanimous jury verdicts. State v. Edwards, 420 So.2d 663 (La.1982).

Other Crimes Evidence
Defendant objected to the introduction of what it alleged were "other crimes" evidence by Chelsy Tyson, Calvin Ray, and Jaroid Robinson. The state filed two motions to introduce other crimes evidence. The first, six days before the start of the trial, and the second, two days before trial. Even so, defendant conceded that there were no discovery problems. Two Prieur hearings were held after commencement of trial, and the trial court found that the testimonies were admissible.
For evidence of other crimes to be admissible, the state must: 1) prove with clear and convincing evidence that the other acts or crimes occurred and were committed by defendant; 2) demonstrate that the other acts satisfy one of the requirements listed in La. C.E. art. 404 B(1), i.e., motive, opportunity, preparation, plan, intent, knowledge, identity, absence of mistake or accident; and 3) show that the probative value of the evidence outweighs its prejudicial effect. State v. Jackson, 625 So.2d 146 (La.1993).
*328 Jaroid Robinson's testimony that defendant loaded and shot the gun a month before the incident is not other crimes evidence. Rather, it is a factual statement that addresses the question of defendant's specific intent or that the gun accidentally fired. We again note, that when justification or self-defense is raised by the defendant, the state has the burden of proving beyond a reasonable doubt that the killing was not perpetrated in self-defense. State ex rel. D.P.B., supra.
The testimony of the next door neighbor, Chelsy Tyson, was that a week prior to the shooting, she heard, from the other side of the wall separating the two apartments, the victim say, "I'm not going to hit you. Put down the gun." Tyson's testimony was also used by the defense to show the volatile relationship between the parties. We note defendant's claim that the hole in the wall in the living room occurred when the victim slammed her head against the wall. This statement by the victim, Terrence Henderson, does not indicate the commission of a crime but has weight that he, Henderson, had a history of striking the defendant and that defendant picked up the gun in defense. Even though defendant had not yet testified, the jury was aware of the defense of justification from the start of the trial. This testimony by Tyson was not other crimes evidence. We also note that if it was erroneous other crimes evidence, it was subject to a harmless error review and this statement was clearly harmless and even beneficial to defendant. State v. Roberson, 40,809 (La.App. 2d Cir.04/19/06), 929 So.2d 789; State v. Gatti, 39,833 (La. App. 2d Cir.10/13/05), 914 So.2d 74, writ denied, 05-2394 (La.04/17/06), 926 So.2d 511.[1]
The testimony of Calvin Ray is more problematic. He testified that a week before the killing of Henderson that defendant put a knife to Henderson's throat and stated her desire to kill him. This fact assertion is very similar to that made in State v. Mamon, 26,337 (La.App. 2d Cir.12/16/94), 648 So.2d 1347, writ denied, 94-0220 (La.06/02/95), 654 So.2d 1104. In Mamon, this court wrote:
Next the State must show that the act falls within an art. 404 B exception and is independently relevant and not introduced merely to show the defendant's bad character. The State argued at the Prieur hearing that the evidence of the prior stabbing tended to prove the defendant's intent. At trial, the State argued that the evidence was admissible to show the absence of a mistake or accident. In order to convict for second degree murder, the State must prove that *329 the defendant had specific intent to kill or inflict great bodily harm upon the victim.
. . .
Evidence showing that defendant stabbed the victim with a knife in a strikingly similar manner just three days before the fatal stabbing tends to negate the defense that defendant acted without intent or that the charged offense was accidental. (Citations omitted).
In the case sub judice, the state complied with State v. Prieur, 277 So.2d 126 (La. 1973), by furnishing defendant with notice when it learned of this testimony and proved by clear and convincing evidence the occurrence of the prior act. As in Mamon, supra, the prior act happened a week before the killing and tended to negate that defendant was without intent or that the act was accidental. The potential prejudice does not outweigh the probative value. Even though defendant had not yet testified, the jury was aware of the defense of justification from the start of the trial. Defendant's entire justification defense was based upon a continued pattern of arguments and fights. See State v. Harvey, 26,613 (La.App. 2d Cir.01/25/95), 649 So.2d 783, writs denied, 95-0430, 95-0625 (La.06/30/95), 657 So.2d 1026, 1028.

Challenge for Cause
Defendant argues that the trial court should have granted the defendant's challenge for cause to prospective juror Tommie H. Walker because he knew one of the witnesses through his former job as a Webster Parish deputy sheriff and because he stated that he had a close friend who had been the victim of murder.
Defendant did not object to the trial court's denial of her challenge for cause. Therefore, she is prohibited from raising the issue on appeal. La. C. Cr. P. art. 841; State v. Walker, 28,577 (La.App. 2d Cir. 10/04/96), 681 So.2d 1023.

Conclusion
For the foregoing reasons, defendant's conviction and sentence are affirmed.
DREW, J., dissents with written reasons.
DREW, J., dissenting:
Finding this killing a justifiable homicide committed in self-defense would serve justice.
At the time of the shooting, Candice Malone and her boyfriend, Terrance Henderson, had lived together about six months, during which period he abused her frequently, about every other day, according to Malone. Photos of her body, taken five days after the shooting, reflected a black eye, old scissor marks on her neck, extensive bruising on her face, legs, and arms, particularly in the area of one elbow, grip mark bruises, and a cigarette burn on the back of her shoulder, all apparently inflicted by Henderson. A head-high hole in an inside wall was caused by Henderson throwing her against the wall. On the day of the shooting, investigators found near Malone's bed an ice bag, by then full of meltwater, bolstering her story that Henderson had given her a black eye just the day before. Malone was a classic battered woman.
Immediately before the shooting, Malone was packing her bag in a vain attempt to escape this abusive relationship. Henderson entered the room to get some change. He left, but quickly returned in anger. They struggled; she pointed the gun; he ducked, and she killed him.
Much of the state's case rests on the testimony of Jaroid Robinson, cousin of Henderson, who was present in the next room at the time of the shooting. Robinson was permitted to provide the jury with his questionable interpretation of the shadows he allegedly observed at the moment of the shooting. His testimony that the *330 decedent had significant bruises inflicted by Malone was belied by the testimony of Dr. Frank Peretti, the forensic pathologist who found no bruises on Henderson when he performed the autopsy.
The petit jury convicted Malone 10-2 of second degree murder. A 20-year-old with an otherwise unblemished record now faces a mandatory life sentence.
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that she is in imminent danger of losing her life or receiving great bodily harm and that deadly force is necessary to save her life. La. R.S. 14:20(A)(1); State v. Dooley, 38,763 (La.App. 2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30.
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. D.P.B., 02-1742 (La.05/20/03), 846 So.2d 753. Despite a skillful prosecution, this burden was not met. The evidence here does not preclude the probability that Henderson, the prototypical domestic batterer, reentered the bedroom to beat Malone as he had done countless times in the recent past.
The record establishes that Malone reacted in self-defense. The jury erred in finding otherwise. I would reverse and vacate the conviction and enter a judgment of acquittal. Accordingly, I respectfully dissent.
APPLICATION FOR REHEARING
Before BROWN, GASKINS, PEATROSS, DREW and LOLLEY, JJ.
Rehearing denied.
DREW, J., would grant rehearing.
NOTES
[1] Defendant also argues that Tyson's testimony was inadmissible hearsay. In State v. Hennigan, 404 So.2d 222 (La. 1981) the court stated:

Hearsay evidence is inadmissible in criminal trials. LSA-R.S. 15:434 and 15:463. State v. Toomer, 395 So.2d 1320 (La., 1981). State v. Martin, 356 So.2d 1370, at 1373-1374 (La. 1978) adopted Professor McCormick's definition of hearsay evidence:
"`Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' C. McCormick, Evidence, Section 246 (Cleary ed.1972)."
Toomer noted that evidence is not hearsay when offered to prove only that it occurred, State v. Hatcher, 372 So.2d 1024 (La. 1979), or that a conversation took place. State v. Ford, 368 So.2d 1074 (La. 1979). Several of defendants' objections to alleged hearsay statements were properly overruled because they were not hearsay; they were not offered to prove the truth of the facts recited in the declaration.
Tyson was testifying as to an argument next door. The statement was not introduced to prove the truth of the matter asserted.