CHEHARDY, C.J.
I defendant, Emilio Calderon, appeals his convictions and sentences for second degree murder and first degree feticide. For the reasons that follow, we affirm his cofivictions and sentences, and remand the matter for correction of the commitment.
FACTS AND PROCEDURAL HISTORY
Katherine Martinez was found strangled to death in her apartment on June 7, '2014. She was eight months pregnant. Years before, in 2007, wh.en Katherine was sixteen years old, she immigrated to the United States with her mother, Orla Martinez. They initially settled in New York City;' but after Katherine had finished high school, she and her mother moved to Gretna in 2011, where Katherine got a job and began pursuing a career in nursing. Katherine also maintained a social life, befriending Santos Reyes, Juan Lozano, and Emilio Calderon, defendant. Although she was romantically involved with each of these men to varying degrees at various points in time, the evidence suggests Katherine established a steady relationship with Mr. Lozano sometime in. 2012 and became pregnant with his child in late 2013.[1]
On the night of Saturday, June 7, 2014, Katherine and Mr. Lozano were to pick up Katherine’s mother from the airport. Mrs. Martinez, who was in New York,, had spoken with Katherine that morning, but was unable to get in touch with her after 1:00 p.m. eastern time. Growing concerned, Mrs. Martinez called Santos Reyes around *832 5:00 p.m. central time to see if he could get in touch with Katherine. Mr. Reyes sent several text messages to Katherine but got no response. At Mrs. Martinez’s insistence, Mr. Reyes went to Katherine’s apartment looking for her. The lights were out and nobody answered the door, so he assumed she was not home and he left.
laMrs. Martinez arrived at the New Orleans airport around 11:00 p.m. Mr. Reyes picked her up and they went straight to Katherine’s apartment in Gretna. They forced open the door and found Katherine unresponsive on the kitchen floor. Mr. Reyes immediately began administering first aid, but soon realized that Katherine was stiff and cold to the touch. After failed attempts to revive her with fingernail polish remover, they called 9-1-1.
Detective Gabriel Faucetta of the Jefferson Parish Sheriffs Office (“JPSO”) responded to the scene around 1:00 a.m. on June 8, 2014. Katherine lay face up on the kitchen floor in only a brassiere, shorts, and underwear. Several of her acrylic fingernails were broken off, suggesting a struggle had occurred. She had sustained several stab wounds.
The autopsy later confirmed Katherine’s cause of death was asphyxia due to strangulation. This was also her unborn child’s cause of death. It was determined that the five stab wounds had not caused her death because she had not lost a fatal amount of blood. It was estimated that Katherine had been dead between four and twelve hours at the time she was found.
Through his investigation, Detective Faucetta was put in touch with Katherine’s boyfriend, Mr. Lozano, who agreed to meet with him at the detective bureau. Mr. Lozano was very cooperative: he answered the detective’s questions, allowed officers to search his cell phone, and provided a DNA sample. Mr. Lozano also removed his shirt and permitted officers to examine his body for injuries or scratches. None were found. Officers searched Mr. Lozano’s vehicle, house, and business, but located nothing of value. Through the use of cellular records, Detective Faucetta corroborated Mr. Lozano’s whereabouts on June 7, 2014. Mr. Lozano was ruled out as a suspect.
Similarly, Mr. Reyes agreed to meet with detectives, and was also very cooperative, allowing officers to search his cell phone, providing a DNA sample, |sand permitting an examination of his body, which did not reveal any injuries or scratches. Mr. Reyes’ whereabouts on June 7, 2014 were also corroborated with his cellular records. He too was ruled out as a suspect.
As detectives continued their investigation, Mrs. Martinez advised them of troubling conversations she had with defendant through Facebook and WhatsApp, a text messaging application. The evidence suggested that defendant and Katherine had a falling out and that Katherine cut off communication with him, blocking him on social media. This prompted him to reach out to her mother. In a Facebook conversation on October 26, 2012, defendant told Mrs. Martinez that Katherine had hurt him but that he still loved her and did not know what to do.[2] Then, two days later, defendant messaged Mrs. Martinez asking for Katherine’s phone number, explaining that “despite the insults, the lies, everything, I still love her and cannot forget her.” On November 4, 2012, Mrs. Martinez relayed to defendant Katherine’s message that she did not want to hurt him but it was best for him to forget about her. Months later, *833 on April 7, 2013, defendant messaged Mrs. Martinez asking her to tell Katherine that he loved her, that she was the love of his life, and that he would wait his whole life for her. Over the next several months, defendant continued to communicate with Mrs. Martinez through Facebook, attempting to reunite with Katherine, with no success. Finally, in May of 2014, defendant asked Mrs. Martinez if Katherine was pregnant. Upon learning that she was, he responded with two emojis of crying faces.
Detective Faucetta decided to follow this lead and obtained defendant’s cellular records. Analysis of these records revealed that on the morning of June 7, 2014, defendant’s cell phone was in close range of the shipyard in Lafourche Parish where he was employed. As the day progressed, the records reflect that his cell phone gradually drew closer in range to the victim’s apartment. At 2:05 p.m., phis phone was within one mile of the victim’s apartment. Thereafter, the records indicate that his cell phone drew progressively distant from her apartment and closer to the shipyard, where it finally stopped.
■ With this information, on June 10, 2014, Detective Faucetta coordinated with the Lafourche Parish Sheriffs Office to meet with defendant at the shipyard. Defendant agreed to accompany the detectives to the Lafourche Parish Sheriffs Office, where he was advised of his rights, agreed to waive them, and spoke with the officers. Defendant gave four recorded statements that day. Though defendant is able to communicate in English, his primary language is Spanish. Accordingly, in defendant’s first two statements, Lieutenant Valerie Martinez of the Lafourche Parish Sheriffs Office assisted with translation. Detective Julio Alvarado of JPSO assisted in defendant’s third and fourth statements.
In his first statement, which began at 4:34 p.m. and concluded at 4:52 p.m., defendant explained that he had known Katherine for two years and that they had intermittent sexual relations, but that they had- not dated exclusively. He stated that he gave her money for a plane ticket to New York and $2,000 to buy a car. He claimed the last time he saw her was two weeks prior when they met in a hotel room to have sex. He denied being in Gretna over the weekend and stated that his cell phone was with him at all times over the weekend.
In his second statement, which began at 5:21 p.m. and concluded at 5:40 p.m., defendant began to change his story. He now acknowledged that he was in Gretna on June 7 because Katherine texted him and asked him to come to her apartment. He explained he went there around 2:00 or 3:00 p.m. to have sex with her. He was waiting in the parking lot when she texted him and told him that she could not see him because she was busy. So he left. He denied entering Katherine’s apartment that day. He admitted that he loved her and that after she “de-friended” him on Facebook, he created an alias to continue to watch her.
| ¿After concluding the second statement, the detectives took a break and defendant was given some time to rest by himself. During this break, a search warrant was secured to obtain a DNA sample from defendant and to examine his body. This .examination revealed scratches and bruises on his upper left chest.
The detectives questioned defendant about these injuries in his third statement, which began at 9:30 p.m. and concluded at 9:45 p.m. In this statement, defendant’s story continued to change. He now admitted that he entered Katherine’s apartment on June 7. He explained that when he arrived around 2:00 p.m., Katherine texted him and told him to come inside. They had sex on the sofa, and afterwards Katherine *834 told him she had things to do, so he left. He disposed of the condom he had used in a garbage can outside her apartment. He estimated that he was in the apartment for approximately one hour. Defendant reiterated that he loved Katherine and stated that he was hurt and angry when he learned that she was pregnant with another man’s child.
When the detectives questioned defendant about the scratches and bruises on his chest, he explained that he sustained those injuries at his job where he was frequently burned when welding. He denied being scratched by Katherine or being involved in a physical altercation with her. He denied killing Katherine.
In his fourth statement, which began at 10:11 p.m. and concluded at 10:37 p.m., defendant admitted to killing Katherine, but explained he did so because she attacked him. He again recounted that they had sex on the sofa, after which she asked him for $600. When defendant told her that he would give her the money another day, Katherine exclaimed, “Son of a bitch I want my money!” and began hitting defendant, who was not yet fully dressed and did not have his shirt on. He explained this was how he received the scratches and bruises on his chest. Katherine stopped momentarily, retreated to the kitchen, and came back with a knife. Continuing to scream at defendant, she “launched” forward to stab him. | ^Defendant wrested the knife away from Katherine, who resumed striking him with her hands. Bothered, upset, and angry that she would not stop hitting him, defendant stabbed her once in the side and threw the knife to the kitchen floor. As she continued to scream and strike defendant, he grabbed her by the neck “to control her.” She did not relent so defendant squeezed Katherine’s neck tightly with one hand and pushed her up against the kitchen wall. She went lifeless and fell to the ground when he released his hand. Defendant grabbed Katherine’s apartment key, the knife, and the condom, left the apartment, locked the door, and discarded the items in the dumpster outside. (A search of this dumpster turned up nothing). Defendant explained he did not go to Katherine’s apartment that day with the intention of killing her. He did so because she attacked him and he expressed remorse about doing it.
Laura Oliver, a DNA analyst with the JPSO DNA Laboratory and a qualified expert in the field, conducted DNA analysis in this case. Ms. Oliver tested four of Katherine’s acrylic fingernails, only three of which yielded usable DNA profiles. Each of these three nails contained two DNA profiles. In each nail, Ms. Oliver found one of these profiles was consistent with that of Katherine, but could only draw a conclusion regarding the second DNA profile in just one of the three. In this third nail, Ms. Oliver excluded Juan Lozano and Santos Reyes as possible donors for the second DNA profile, but could not exclude defendant. From this, Ms. Oliver concluded that it was T.l billion times more likely that the two DNA profiles in this third nail were attributable to Katherine and defendant rather than attributable to Katherine and an unknown individual. Moreover, Ms. Oliver sent these DNA profiles from this third nail to Dr. Mark Perlin at Cyber Genetics in Pennsylvania to verify the results. Dr. Perlin concluded that the match between the DNA profile from the third,nail and defendant was 134 million times more probable than a coincidence.
|7Ms.- Oliver also conducted another DNA test focusing only on the Y chromosome exclusive to males. This test revealed that there was a 99.97% probability that the male DNA profile present in one of the fingernails belonged to defendant. Similar *835 ly, there was a 99.98% probability that the male DNA profile present in another fingernail belonged to defendant.
On September 18, 2014, a Jefferson Parish Grand Jury returned an indictment charging defendant with the second degree murder of Katherine Martinez, a violation of La. R.S. 14:30.1 (count one), and with the first degree feticide of her unborn child, a violation of La. R.S. 14:32.6 (count two). Defendant entered a plea of not guilty. In anticipation of trial, the State filed motions in limine seeking to exclude from evidence exculpatory statements from anonymous sources. These motions were heard on September 3, 2015 and granted.
On September 22, 2015, the matter proceeded to trial by jury. On September 24, 2015, the twelve-person jury returned a verdict of guilty as charged on both counts. At the sentencing hearing on October 7, 2015, defense counsel orally moved for' a new trial on-the basis that the court had erred in its September 3 rulings on the motions in limine. This was reduced to a written motion, which the court denied that day.
Defendant waived sentencing delays and was sentenced on count one, to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, and on count two, to fifteen years at hard labor, to be served consecutively to his sentence on count one. Defendant was later granted an out-of-time appeal.
DISCUSSION
In defendant’s sole assignment of error on appeal, he argues that the district court erred in granting the State’s motions in limine, excluding from evidence a text message sent to Orla Martinez and the testimony of a prospective defense | ^witness. These rulings, defendant contends, deprived him of his constitutional right to present a defense.
In January of 2015, Mrs. Martinez advised the Jefferson Parish District Attorney’s Office that on January 17, 2015 she received a text message from an unknown Honduras telephone number regarding Katherine’s murder. The message was in Spanish and was translated by Detective Julio Alvarado, It provided: ,
Hello Ms. Orla I was at the point of telling you this personally, but I could not risk telling on myself and I am not that big of an asshole to stay in the United States and be imprisoned for the rest of my life. I honestly feel bad for what happened to Kata[.] We- had a one year relationship that when she came from New York from that time I discovered that she was laying down with two more in New York and three in Louisiana I investigated everyone and was .able to confirm that she did cheat on me.
Well when we were together everything was very good between us and we spent the.24th.of December that was the day • she supposedly became pregnant and I was lied to[.] I know everything about those guys and everything that happened was an accident[.] I arrived at the apartment by myself to confront her and for her to pay me money that she asked to borrow[.] I only wanted to scare her and she got stupid with the knife and wanted to hurt me and well, all finish .like that[.] It could have been worse if not for the guy that found me[.]
Guilty of what happened and yes the guy that found me in the apartment came to talk and let him come and go here and find out there because his fault I did not do more and wanted to tell her that Mr. Tomas but I see that Kata gave more to you all I am very sorry for you all but she is the one[.] When you family found out and I did what I supposedly *836 have done is shot her in the head an[d] never talk to her again.
The State turned this information over to the defense during discovery. Through further investigation, the defense learned that defendant has a son with Nora Perei-da, both of whom reside in Honduras. The defense made contact with Ms. Pereida in July of 2015. During their conversation, Ms. Pereida explained that beginning in July of 2014, she began receiving telephone calls from a private number wherein the unidentified caller threatened her son if defendant did not take the fall for Katherine’s murder. Ms. Pereida stated that she continued to receive these calls over the next several months. Seeking to have Ms. Pereida testify at |fltrial, the defense moved for a continuance on July 27, 2015, which the court granted.
Also on July 27, 2015, the State filed a motion in limine seeking to exclude from evidence the text message sent by an anonymous source to Mrs. Martinez on January 17, 2015. The State filed its second motion in limine on August 20, 2015, seeking to exclude testimony from Nora Pereida regarding the anonymous threats she received. The two motions were heard on September 3, 2015 and granted in open court. The defense objected.
In defendant’s motion for new trial following his conviction, he argued the court’s erroneous rulings on the State’s motions in limine warranted a new trial. The court denied this motion; and now, on appeal, defendant argues that the district court’s erroneous rulings on the State’s motions in limine violated his constitutional right to present a defense.
At the outset, we note that the issue of the exclusion of Ms. Pereida’s testimony has been preserved for our review. Louisiana Code of Evidence Article 103(A)(2) provides that “Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [w]hen the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.” This Court has held that if a party does not comply with this article by failing to make known to the court the substance of excluded evidence, an error predicated upon the evidence’s exclusion is not preserved for appellate review. See State v. Thompson, 12-409 (La.App. 5 Cir. 12/11/12), 106 So.3d 1102, 1109, writ denied, 13-111 (La. 8/30/13), 120 So.3d 258.
The Louisiana Supreme Court has explained that the substance of evidence is “made known to the court” for purposes of La. C.E. art. 103(A)(2) “by proffer, either in the form of a complete record of the excluded testimony or a statement | ^describing what the party expects to establish by the excluded evidence.” State v. Magee, 11-574 (La. 9/28/12), 103 So.3d 285, 326. Here, we find the substance of Ms. Pereida’s testimony was made known to the court via defendant’s motion to continue filed on July 27, 2015 and defendant’s opposition to the State’s motion in limine filed on August 31, 2015. Both of these pleadings describe the testimony Ms. Per-eida would offer regarding the content of the alleged threatening phone calls she received. We find this was sufficient under La. C.E. art. 103(A)(2) and Magee, supra to preserve this issue for our review.[3]
*837 A motion in limine presents an evi-dentiary matter that is subject to the great discretion of the trial court. Moonan v. La. Med. Mut. Ins. Co., 16-113 (La.App. 5 Cir. 9/22/16), 202 So.3d 529, 534, writ denied, 16-2048 (La. 1/9/17), 214 So.3d 869, 2017 WL 347578, 2017 La. LEXIS 50; State v. Francois, 13-616 (La.App. 5 Cir. 1/31/14), 134 So.3d 42, 55, writ denied, 14-431 (La. 9/26/14), 149 So.3d 261. Accordingly, we will not disturb the district court’s rulings on the State’s motions in limine absent an abuse of discretion.
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. State v. Smoot, 13-453 (La.App. 5 Cir. 1/15/14), 134 So.3d 1, 7, writ denied, 14-297 (La. 9/12/14), 147 So.3d 704. This fundamental right may not be superseded by evidentiary rules. Id. (citing State v. Van Winkle, 94-947 (La. 6/30/95), 658 So.2d 198, 202). For instance, normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant’s right to present a defense. Id. At the same time, however, a defendant’s right to present a defense does not require a trial court to permit the introduction of evidence that is irrelevant or has so little 11 probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. Id. Indeed, the Louisiana Supreme Court has noted that this jurisprudential “fairness exception” to the hearsay rule is unusual and should be sparingly applied. Id. (citing State v. Trahan, 576 So.2d 1, 11 (La. 1990)).
In State v. Smoot, 13-453 (La.App. 5 Cir. 01/15/14), 134 So.3d 1, writ denied, 14-297 (La. 9/12/14), 147 So.3d 704, this Court considered the applicability of the “fairness exception” under a similar set of facts to those presently before us. In Smoot, the defendant, who had been convicted of second degree murder, argued on appeal that his right to present a defense had been violated when the trial court granted the State’s motion in limine to exclude evidence of an anonymous telephone call to Crimestoppers naming someone other than the defendant as the perpetrator. This Court found this hearsay evidence did not qualify under the “fairness exception” because there was nothing to suggest that the evidence was reliable or trustworthy. Smoot, 134 So.3d at 8. The Court noted that the declarant of the tip was anonymous, no evidence corroborated the tip, and all the evidence adduced at trial contradicted the tip and indicated the defendant was the perpetrator. Id.
In the instant case, the text message sent to Ms. Martinez and the content of the alleged phone calls to Ms. Pereida are unquestionably hearsay. Both are out-of-court statements being offered for the truth of the matter asserted, namely, that an unidentified individual murdered Katherine. We do not find any statutory hearsay exceptions apply, and so consider whether this otherwise inadmissible hearsay should come in under the jurisprudential “fairness exception.”
Similar to Smoot, both the text message and the alleged phone calls are from anonymous sources. This fact alone raises serious doubts about the reliability and trustworthiness of this evidence. As the United States Supreme Court has | ^observed, albeit in the Fourth Amendment context: an anonymous tip “provides virtually nothing from which one might conclude that its author is either honest or his information reliable[.]” Illinois v. Gates, 462 U.S. 213, 227, 103 S.Ct. 2317, 2326, 76 L.Ed.2d 527 (1983).
Additionally, no evidence corroborates the text or calls. None of the evidence offered even hinted at the possibility that another individual was in Katherine’s *838 apartment on the day of her murder. In fact, all of the evidence adduced at trial supports the opposite conclusion that defendant was the perpetrator. Most notably, defendant confessed to killing Katherine. He does not contest this confession here on appeal, and his confession is corroborated by forensic evidence. Defendant’s cell records place defendant in proximity, both in time and place, to Katherine’s murder. Defendant stated that he choked Katherine until she went lifeless, and the coroner determined that Katherine’s cause of death was asphyxia due to strangulation.Defendant’s chest bore scratches and bruises consistent with a struggle; and the DNA evidence confirmed with near-certain probability that the DNA material found underneath Katherine’s fingernails broken off in the struggle moments before her death belonged to defendant.
■After considering that the anonymous text message to Mrs. Martinez and the anonymous phone calls to Ms. Pereida were not corroborated by any evidence at trial and bear no indicia of reliability or trustworthiness, we are not convinced that their exclusion compromised defendant’s right to present a defense. We therefore conclude that this evidence does not qualify under the “fairness exception” to the hearsay rule and that the district court‘did not abuse its discretion in granting the State’s motions in limine to exclude this evidence.
This assignment of error is without merit.
J^ERRORS PATENT
The record was reviewed for errors patent, according to La. C.Cr.P, art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Wetland, 556 So.2d 175 (La. App. 5 Cir. 1990). Upon review, we find -defendant’s sentence benefits are not clearly reflected in the commitment or the Uniform Commitment Order, Accordingly, we remand the matter for the district court to -amend both the commitment and the Uniform Commitment Order to reflect that on count one (second degree murder), defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, and that on count two-(first degree feti-cide), defendant was sentenced to fifteen years at hard labor without restriction of benefits. The Clerk of Court for the 24th Judicial District Court is ordered to transmit the originals of the amended commitment and Uniform Commitment Order to the officer in charge of the institution to which defendant has been sentenced and to the Department of Corrections’ Legal Department, See State v. Lyons, 13-564 (La.App. 5 Cir. 1/31/14), 134 So.3d 36, 41, writ denied, 14-481 (La. 11/7/14), 152 So.3d 170.
DECREE
For the foregoing reasons, defendant’s convictions and sentences are affirmed. The matter is remanded for correction of the commitment and the Uniform Commitment Order,
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT

. DNA tests confirmed that Juan Lozano was the father of the child.

. It is noted that these conversations were originally in Spanish and were translated at trial by an interpreter.

. We decline to undertake a similar analysis regarding the anonymous text message received by Mrs. Martinez because the translated text of the message was attached as an exhibit to the State’s motion in limine filed on August 20, 2015, and so was unquestionably "made known to the court” in accordance with La. C.E. art. 103(A)(2) and Magee, supra.